**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

|  |  |
|---|---|
| CURTIS TRAMMELL, CHRISTOPHER BRYANT CRABTREE, CYNTHIA DEMOTT, DAVID DEMOTT, ARCHIE PARSLEY, CHRISTOPHER ANDERSON, RAINBOW RIVER KAYAK ADVENTURES, LLC, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>CSX TRANSPORTATION, INC., FLORIDA NORTHERN RAILROAD COMPANY, LLC, and TRACK LINE RAIL, LLC,<br><br>                    Defendants. | Case No. _____<br>State Case No. 26-CA-00407-AX |

**DEFENDANTS CSX TRANSPORTATION, INC. AND
FLORIDA NORTHERN RAILROAD COMPANY, LLC'S
JOINT NOTICE OF REMOVAL OF CIVIL ACTION**

Defendants CSX Transportation, Inc. ("CSX") and Florida Northern

Railroad Company, LLC ("Florida Northern") (together with CSX, the "Removing

Defendants"), by and through their respective undersigned counsel, pursuant to

28 U.S.C. §§ 1331, 1332(d), 1367, 1441, 1446 and 1453, and Local Rule 1.06, hereby

remove this action, Case No. 26-CA-000407-AX, from the Circuit Court of the Fifth

Judicial Circuit in and for Marion County, Florida to the United States District

Court for the Middle District of Florida, Ocala Division.  The Removing Defendants state as follows in support of this Notice:

## INTRODUCTION

1.      Plaintiffs Curtis Trammell and Christopher Bryant Crabtree filed their initial Class Action Complaint and Demand for Jury Trial on February 23, 2026. The Complaint was never served on any of the Defendants.

2.      On May 19, 2026, Plaintiffs filed their operative Amended Class Action Complaint and Demand for Jury Trial, a copy of which (with exhibits) is attached hereto as **Exhibit A**.

3.      The Amended Complaint asserts multiple claims against CSX, Florida Northern, and Track Line Rail, LLC ("Track Line"), all of which stem from a railroad tie fire that occurred in Marion County on February 1, 2026.

4.      On May 21, 2026, Plaintiffs purported to serve the Amended Complaint on CSX and Florida Northern.

5.      On May 26, 2026, Plaintiffs purported to serve the Amended Complaint on Track Line.

6.      This Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b), in that it is filed within thirty (30) days after the first receipt by CSX and Florida Northern, through service, of the Amended Complaint. *See* 28 U.S.C. § 1446(b) ("The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the

2

initial pleading setting forth the claim for relief upon which such action or proceeding is based . . . .").

7.     Track Line Rail, LLC consents to the removal of this case.

8.     Pursuant to 28 U.S.C. § 1446(a) and Local Rule 1.06, a copy of the docket and all filings made in the State Action are attached to this Notice as Exhibits "B" and "C," respectively. Plaintiffs' original Complaint is located on pages 4-51 of Exhibit C.

9.     Promptly upon filing this Notice of Removal, pursuant to 28 U.S.C. § 1446(d), the Removing Defendants will provide written notice to Plaintiffs and will file a notice with the Circuit Court of the Fifth Judicial Circuit in and for Marion County, Florida.

10.     Venue is proper in this Court under 28 U.S.C. § 1441(a) and Local Rule 1.06(a) because the Circuit Court of the Fifth Judicial Circuit in and for Marion County, Florida, is located within the district of the United States District Court for the Middle District of Florida. *See* 28 U.S.C. §1441(a) ("[A]ny civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.").

**<u>ALLEGATIONS</u>**

11.     Plaintiffs allege that Track Line "owned thousands of creosote-treated railroad ties that burned in the Railroad Tie Fire" on property that was "owned by

Defendant CSX and leased by Defendant Florida Northern." (Ex. A, ¶¶ 35, 37.) Plaintiffs further allege that the Railroad Tie Fire resulted in "contamination of, and exposure to, toxic smoke, noxious odors, massive amounts of carcinogenic volatile and semi-volatile organic compounds ... and other toxic chemicals and combustible materials." (*Id.* ¶ 1.)

12.    The Amended Complaint brings eight separate claims against Defendants for **(i)** negligence, **(ii)** strict liability under Florida's Water Quality Assurance Act (Fla. Stat. §§ 376.30 *et seq.*), **(iii)** private nuisance, **(iv)** public nuisance, **(v)** trespass, **(vi)** trespass to chattels, **(vii)** medical monitoring, and **(viii)** intentional misconduct/gross negligence.

13.    These putative class claims are brought on behalf of four separate "proposed Classes," which are defined as follows:

- The ***Residents Class***, comprised of all individuals who resided within a 30-mile radius of the Railroad Tie Fire site from February 1, 2026, through present.

- The ***Property Owners Class***, comprised of all individuals or legal entities who owned or otherwise had a legal interest in real property located within a 30-mile radius of the Railroad Tie Fire site from February 1, 2026, through present.

- The ***Employees Class***, comprised of all individuals who worked within a 30-mile radius of the Railroad Tie Fire site from February 1, 2026, through present.

- The ***Business Class***, comprised of all individuals or legal entities who owned or operated a business located within a 30-mile radius of the Railroad Tie Fire site from February 1, 2026, through present.

(Ex. A, ¶¶ 148-151.)

4

14.    While the Amended Complaint does not identify the exact number of Class Members, Plaintiffs allege that "the proposed Class includes ***thousands*** of individuals and organizations who were unlawfully exposed to creosote and other toxic chemicals or who had property contaminated by unlawful exposure to creosote and other toxic chemicals and suffered damages." (*Id.* ¶ 158) (emphasis added).

15.    Further, although the Amended Complaint pleads only minimum amount in controversy for Florida circuit court jurisdiction,[1] it is replete with allegations of significant damages, including punitive damages, numerous categories of compensatory damages, injunctive relief in the form of class wide medical monitoring, continued remediation/testing of the air, water, soil and crops, and an award of attorney's fees.

## JURISDICTION UNDER CAFA

16.    The Court has jurisdiction over this "class action"[2] under the Class Action Fairness Act ("CAFA") because (i) the proposed class contains at least 100 members; (ii) there is minimal diversity (*i.e.*, at least one plaintiff class member is diverse from at least one defendant), and (iii) the aggregate amount in controversy exceeds $5 million. *See* 28 U.S.C. § 1332(d)(2)(A), (d)(5).

---

[1] *See* Ex. A, ¶ 39 ("This is an action in which the amount in controversy, in the aggregate, ***exceeds*** the sum of Fifty Thousand Dollars ($50,000), exclusive of interest, costs, and attorney's fees." (emphasis added)).

[2] This case is a class action as it was brought pursuant to Florida Rule of Civil Procedure 1.220, which is a "State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B) (defining "class action" for CAFA removal).

17.     First, as previously noted, Plaintiffs' Amended Complaint alleges that the total number of class members includes ***thousands*** of individuals and organizations and includes not only compensatory and exemplary damages, but also statutory penalties and other economic and non-economic bases. (Ex. A, ¶ 158.) Thus, the numerosity element of CAFA jurisdiction is satisfied. *See, e.g.*, *Kelly v. State Farm Mut. Auto. Ins. Co.*, No. 5:10–cv–194–Oc–32GRJ, 2010 WL 9888731, at *3 (M.D. Fla. Sept. 23, 2010) (noting that the number of class members was "not seriously in dispute" because "Plaintiffs have alleged in the First Amended Class Complaint that it is believed the class contains more than 1,000 persons, which is well over CAFA's 100 person requirement"), *report and recommendation adopted*, No. 5:10-cv-194-OC-32TEM, 2010 WL 10096066 (M.D. Fla. Nov. 9, 2010).

18.     Second, minimal diversity exists because the Amended Complaint establishes that at least one of the named Plaintiffs, Curtis Trammel, is a citizen of Florida. (Ex. A, ¶ 3.) And Track Line is a citizen of Texas. *See* Ex. A, ¶ 34 ("Defendant Track Line is a Texas limited liability company with its principal place of business in Southlake, Texas."); *see also* 28 U.S.C. 1332(d)(10) ("For purposes of [the CAFA], an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.")

19.     Finally, the amount in controversy exceeds $5 million.

20. The "thousands of individuals and organizations" comprising the proposed class each seek compensatory and exemplary damages, statutory penalties, and interest for property damage, diminution in property value, lost income, and other economic and non-economic losses on behalf of the entire putative class. (*See* Ex. A, ¶¶ 193, 201, 214, 225, 237, 248, 270.)

21. Although the Removing Defendants maintain that Plaintiffs' putative class claims are not certifiable and, even if they were, they still fail as a matter of law and fact and Plaintiffs are not entitled to recover ***any damages*** from the Removing Defendants, for purposes of CAFA removal, "district courts should only consider the amount the plaintiff has placed in controversy, ***not the amount the plaintiff is likely to recover***." *McDaniel v. Fifth Third Bank*, 568 F. App'x 729, 730 (11th Cir. 2014) (emphasis added).

22. The amount in controversy requirement may be satisfied when it is "facially apparent" from the complaint, "even when 'the complaint does not claim a specific amount of damages.'" *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061 (11th Cir. 2010) (quoting *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 754 (11th Cir. 2010) (applying CAFA)). In conducting its analysis, the Court may value the alleged claims, as stated in the Amended Complaint, based on its "judicial experience and common sense." *Roe*, 613 F.3d at 1063. The Court also may consider a wide variety of materials, including "facts alleged in the notice of removal, judicial admissions made by the plaintiffs, non-sworn letters submitted to the court, or other summary judgment type evidence that may reveal that the

amount in controversy requirements is satisfied." *Pretka*, 608 F.3d at 754 (quotation omitted).

23.     While the Amended Complaint pleads only the jurisdictional minimum of $50,000, Plaintiffs in no way suggest that their damages fall below the $5 million threshold for CAFA removal. Indeed, on May 19, 2026, prior to serving the Amended Complaint on the Removing Defendants,[3] Plaintiffs filed their initial disclosures in the state court action in which they assert that they are seeking to recover "an amount ***in excess of $100 Million***" for punitive damages alone. *See* Plaintiffs' Notice of Serving Disclosures Pursuant to Florida Rule of Civil Procedure 1.280 (Ex. C, at pp. 290-96); *see also, e.g.*, *Ramos v. Walmart Stores East, L.P.*, No. 8:25-cv-3521-WFJ-CPT, 2026 WL 194220, at *1-2 (M.D. Fla. Jan. 26, 2026) (denying plaintiff's motion to remand where plaintiff's initial disclosures established that he was seeking damages in excess of the jurisdictional threshold for removal).

24.     Accordingly, Plaintiffs' punitive damage claim alone establishes that CAFA's amount in controversy is met. *See, e.g.*, *McDaniel*, 568 F. App'x at 731 (vacating order remanding class action where district court failed to consider plaintiffs' claim for punitive damages in determining the amount in controversy).

25.     Even putting aside Plaintiffs' punitive damages claim, which independently meets the jurisdictional threshold, Plaintiffs also seek significant

---

[3] Plaintiffs served the Amended Complaint on both CSX and Florida Northern on May 21, 2026.

equable relief "in the form of a medical monitoring program and establishment of a medical monitoring fund." (Ex. A, ¶ 175.)

26.    If Plaintiffs' requested relief is granted, this medical monitoring program will undoubtedly exceed $5 million. For example, Plaintiffs assert that the medical monitoring program must include "periodic diagnostic medical testing and necessary examinations" for the early detection and care of a litany of medical issues that Plaintiffs claim may result from the alleged exposure, "including liver disease such as liver cancer and angiosarcoma of the liver, cancers such as lung, skin, pancreas, kidney, bladder, prostate, rectal, and significant reproductive damage." (Ex. A, ¶ 176.)

27.    In addition to diagnostic testing and examinations for the ***thousands of individual class members***, Plaintiffs' equitable medical monitoring program further requests a "research regimen" and would require Defendants to not only "finance the medical monitoring program" but also "address issues as they develop during the program administration." (*Id.* ¶¶ 175, 182.)

28.    Plaintiffs ultimately seek a court order compelling Defendants to administer the medical monitoring program, and request that the Court

a)    Establish an equitable trust fund completely financed by Defendants;

b)    Appoint an independent fund administrator to manage the fund's operations;

c)    Approve a specialized medical advisory panel to define, implement, and update diagnostic protocols;

d)     Establish a secure diagnostic data collection and tracking system that preserves Class members privacy; and

e)     Supervise a court-appointed notice program to inform Class members of their eligibility . . . .

(Ex. A, ¶ 261.)

29.    To be sure, it is readily apparent based on the face of the Amended Complaint that, if Plaintiffs' equitable request for a medical monitoring program were to be granted, the financing and administration costs will significantly exceed $5 million. *See, e.g.*, *Jovine v. Abbot Laboratories, Inc.*, No. 11–CV–80111, 2011 WL 1337204, at *5 & n.4 (S.D. Fla. Apr. 7, 2011) (denying motion to remand in putative class action where the court could "reasonably infer" that "the amount in controversy requirement [for CAFA removal] is satisfied by the cost of medical monitoring alone"); *In re Welding Fume Prods. Liability Litig.*, 245 F.R.D. 279, 287 (N.D. Ohio 2007) (holding that the cost of medical monitoring fund and other relief could easily exceed $5 million by a factor of 400 or more).

30.    And Plaintiffs' injunctive relief is not limited to just medical monitoring. Plaintiffs further seek remediation and continued, periodic testing of their air, water, soil, crops, livestock and/or pets to ensure they are safe. (Ex. A, ¶¶ 194-95, 202-03, 215-16, 226-27, 238-39, 249-50, 271-72.)

31.    Finally, Plaintiffs' Amended Complaint seeks numerous distinct categories of compensatory damages, including, without limitation, "real property damage, out-of-pocket expense, personal property damage, loss of use and

enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill … and/or loss of use and enjoyment." (*Id.* ¶¶ 193, 201, 214, 225, 237, 248, 270.)[4]

32.    In conclusion, given Plaintiffs' broadly defined classes, the significant punitive and compensatory damages at issue, and Plaintiffs' request for injunctive relief in the form of medical monitoring and continued environmental remediation and testing, the amount in controversy clearly exceeds $5 million. Accordingly, all the requirements for removal under the CAFA are met.

## **FEDERAL QUESTION JURISDICTION**

33.    Independent of CAFA, federal question jurisdiction exists over this matter and justifies removal. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction because Plaintiffs' claims, while not stated as such, are federal in character under the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. §§ 10101 et seq.[5] Accordingly, removal is proper pursuant to 28 U.S.C. §§ 1441 (a), (b), and (c), and under principles of supplemental jurisdiction, 28 U.S.C. § 1367.

34.    The jurisdictional doctrine of complete preemption is a "corollary" to the well-pleaded complaint rule. *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63

---

[4] Plaintiffs' Initial Disclosures provide further detail as to the nature and extent of these various categories of compensatory damages. *See* Ex. C, at p 294-96.

[5] For purposes of this Notice of Removal, the Removing Defendants include allegations from Plaintiffs' Amended Complaint giving rise to federal question jurisdiction, but in no way admit the substance or validity of any of Plaintiffs' allegations, and the Removing Defendants reserve any and all defenses and objections to Plaintiffs' allegations.

(1987).[6] The complete preemption doctrine permits a defendant to remove a state court suit to federal court on the basis of a federal question where the claim could have originally been filed in federal court, and, however couched, is "necessarily federal in character." *Id.* at 63-64; *see also Caterpillar Inc. v. Williams*, 482 U.S. 386, 392-93 (1987). Removal is appropriate when Congress expressly so provides, or "when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). As the Eleventh Circuit has explained, "[c]omplete preemption applies when the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Blab T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.*, 182 F.3d 851, 854 (11th Cir. 1999) (internal citation and quotation marks omitted). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393.

---

[6] Complete preemption is jurisdictional, while the defense of preemption is substantive. The two doctrines are fundamentally and analytically distinct. While Defendants may move to dismiss this action under the defense of ICCTA preemption, this Removal is based on principles of complete preemption. *See, e.g., Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011) ("Complete preemption must be distinguished from 'defensive preemption' (i.e., 'conflict preemption' or 'ordinary preemption'). Defensive preemption does not create federal jurisdiction and simply 'declares the primacy of federal law, regardless of the forum or the claim.'" (internal citations omitted)).

35.    ICCTA's preemptive reach meets the "so extraordinary" standard. *Blab T.V. of Mobile, Inc.*, 182 F.3d at 854. The Supreme Court itself has recognized that regulating railroads has traditionally been "among the most pervasive and comprehensive of regulatory schemes." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981).

36.    Courts nationwide agree that the ICCTA is a statute of sweeping preemptive force. *See Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008) (noting how the ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation" (internal citation and quotation marks omitted)); *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011) (finding complete preemption under the ICCTA as a statute that "so forcibly and completely displaces state law that the plaintiff's cause of action is either wholly federal or nothing at all") internal citation and quotation marks omitted)); *Griffioen v. Cedar Rapids & Iowa City Ry. Co.*, 914 N.W.2d 273, 281 (Iowa 2018) ("[I]nterstate rail operations have traditionally been subject to among the most pervasive and comprehensive of federal regulatory schemes.") (citing *Chicago & N.W. Transp. Co.*, 450 U.S. at 318)); *Maynard v. CSXT Transp., Inc.*, 360 F. Supp. 2d 836, 840 (E.D. Ky. 2004) ("The preemptive effect of the last sentence of section 10501(b) has been examined by several federal circuit and district courts which have consistently held that the ICCTA preempts state common law claims with respect to railroad operations." (collecting cases)); *Columbiana Cty. Port Auth. v. Boardman Twp. Park Dist.*, 154 F. Supp. 2d 1165,

1180 (N.D. Ohio 2001) ("ICCTA also evidences the intent of Congress to preempt the field in which state law previously operated with respect to railroads. In particular, Congress granted the STB exclusive jurisdiction over all matters of rail transportation, including intrastate railroad tracks.").

37.    Congress enacted the ICCTA and created the Surface Transportation Board ("STB") to regulate rail transportation in the United States and to implement a "Federal scheme of minimal regulation for this intrinsically interstate form of transportation." *See* H. R. Rep. No. 104–311, at 93, 96 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 805 (discussing the legislative history of ICCTA as reflecting the preemption of state's economic regulation of railroads); *see also* 49 U.S.C. §§ 10101(2), 10501(a)(1). With the ICCTA's enactment, Congress expressly and categorically preempted state law "regulation of rail transportation." 49 U.S.C. § 10501(b).

38.    "It is difficult to imagine a broader statement of Congress' intent to preempt regulatory authority over railroad operations" than ICCTA. *CSX Transp. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996). ICCTA expresses Congress' broad intent to preempt state regulatory authority over rail operations. *See, e.g.*, *City of Auburn v. United States*, 154 F.3d 1025, 1031 (9th Cir. 1998), *cert. denied*, 527 U.S. 1022 (1999) ("We believe the congressional intent to preempt this kind of state and local regulation of rail lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it."); *Elam*, 635 F.3d at 810 ("Congress was clear that § 10501(b) establishes the 'the complete pre-

14

emption' of state economic regulation of railroads."); *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 563 (6th Cir. 2002) ("[I]t is manifestly clear that Congress intended [that ICCTA] preempt [state statutes and claims] … to the extent that they intrude upon the STB's exclusive jurisdiction . . . ."); *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1070 (11th Cir. 2010) ("[T]o permit monetary liability to accrue under a state law nuisance claim where that liability is based on decisions the ICCTA purposefully freed from outside regulation would contradict the language and purpose of the ICCTA.").

39.    This case is about railroad ties stored and handled on railroad property. The property at issue is owned by CSX and leased to Florida Northern for railroad-related operations, including the use and storage of railroad ties. (Ex. A, ¶¶ 32, 35, 138, 140.)

40.    ICCTA's definition of "transportation" expressly includes "storage" and "handling" on railroad property. *See* 49 U.S.C. § 10102(9)(A)-(B) (defining "transportation" to include any "facility, instrumentality, or equipment of any kind related to the movement of passengers or property" and "services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, **storage**, **handling,** and interchange of passengers and property" (emphasis added)). "Storage" and "handling" on railroad property is precisely the essence of this lawsuit.

41.    The activities centering Plaintiffs' claims map directly onto this statutory text. The interim storage of used railroad ties on CSX's property pending

15

their disposal constitutes "storage" of property related to rail movement, and Track Line Rail's alleged grinding of those ties into mulch constitutes "handling" of that same property.

42.     Railroad ties are essential components of rail infrastructure, and their storage on railroad property constitutes use of a "facility" and "property" that is "related to the movement of passengers or property" by rail. *Id.*

43.     The Amended Complaint alleges that the Removing Defendants were negligent and otherwise tortious in their ownership, management, and oversight of the property on which the rail ties were stored and handled, and that they failed to ensure that the operations on railroad property did not pose a risk of harm. *See, e.g.*, Ex. A. ¶¶ 191-93. These allegations all directly implicate the Removing Defendant's management of their rail facilities and operations. *See, e.g., id.*

44.     The removal and disposition of used railroad ties is a necessary component of track maintenance and is integral to CSX and Florida Northern's (and other railroads') rail operations. The storage and removal of the ties constituted part of CSX's and Florida Northern's transportation operations and the management of their rail facilities.

45.     The Amended Complaint repeatedly seeks "remediation." (Ex. A, ¶¶ 194-95, 202-03, 215-16, 226-27, 238-39, 249-50, 271-72.) Plaintiffs thus ask this Court to direct CSX and Florida Northern on how they manage rail operations by having them "remediate" their practices and exercise of operational judgment.

16

46.   In sum, Plaintiffs' claims, though couched in state law, are "necessarily federal in character," *Metro. Life Ins. Co.*, 481 U.S. at 67, because they seek to dictate how CSX and Florida Northern manage railroad property and instrumentalities, including the leasing of that property to other rail operators and the storage and handling of railroad materials thereon.

47.   Determinations of The Florida Department of Environmental Protection ("FDEP") confirm this outcome. According to the Amended Complaint, FDEP has determined that the CSX property in question was being used for "railroad transportation and freighting operations" executed by Florida Northern and CSX. (*See* Ex. A, ¶ 102.) That a state agency itself classified the activities at issue as "railroad transportation and freighting operations" is a compelling acknowledgment that the operations conducted on CSX's property fall within the heartland of rail transportation—the very subject matter over which the ICCTA grants the STB exclusive jurisdiction.

48.   Plaintiffs' claims are, at their core, an attempt through state tort law to manage or govern the Removing Defendants' railroad property and operations—a function that Congress explicitly delegated exclusively to the STB. As the Supreme Court has recognized, state "regulation can be ... effectively exerted through an award of damages," and "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (citation omitted).

49.     The judgment sought in this case would penalize CSX and Florida Northern for how they "manage or govern railroad transportation" and for their supposed failure to "remediate" these practices—precisely what ICCTA prohibits. *See Kiser v. CSX Real Property, Inc.*, 2008 WL 4866024, *3-4 (M.D. Fla. Nov. 7, 2008) (finding nuisance claims preempted by ICCTA where plaintiff sought to regulate or prevent railroad company's development plan).

50.     Furthermore, as stated above, Plaintiffs seek punitive damages in excess of $100,000,000. (Ex. C, at p. 296.) Courts recognize that "[t]o allow [plaintiffs] to seek and recover punitive damages in a state court is to allow almost unlimited state 'regulation.'" *S.D. ex rel. S.D. R.R. Auth. v. Burlington N. & Santa Fe Ry. Co.*, 280 F. Supp. 2d 919, 934 (D.S.D. 2003) (finding complete preemption based in part on prayer for punitive damages).

51.     Facing like allegations, courts have found complete preemption under ICCTA. *E.g.*, *Elam*, 635 F.3d at 806-08 (finding ICCTA completely preempted negligence per se claim because it sought to impose state law duties on railroad operations); *Voigt v. CSX Transp., Inc.*, No. 3:17-CV-01018-N, 2017 U.S. Dist. LEXIS 224965, *17 (N.D. Tex. June 19, 2017) (finding ICCTA completely preempted negligence claim based on design and construction of railroad grade crossing as it attempted to manage or govern railroad operations); *Ezell v. Kan. City S. Ry. Co.*, No. 1:14CV120-SA-DAS, 2016 WL 2907710, at *2-3 (N.D. Miss. May 18, 2016), judgment entered, 2016 WL 2904916, aff'd, 866 F.3d 294 (5th Cir. 2017) (finding ICCTA completely preempted state law negligence claims because

18

they constituted an attempt to regulate railroad transportation under the guise of state tort law). Courts have likewise preempted nuisance, trespass, and property-interference claims arising from railroad property management—the claims featured in the Amended Complaint. *Cedarapids, Inc. v. Chicago, Cent. & Pac. R.R. Co.*, 265 F. Supp. 2d 1005, 1013-15 (N.D. Iowa 2003) (finding ICCTA completely preempted state tort claims arising from railroad operations); *Jie Ao & Xin Zhou* – Pet. for Declaratory Order, S.T.B. No. FD 35539, 2012 WL 2047726, at *7 (S.T.B. served June 6, 2012) (finding ICCTA completely preempted claims that would "affect the amount and type of maintenance that could be performed on [a] railroad ROW"); *Canadian Nat. Ry. Co. v. Montreal, Maine & Atlantic Ry., Inc.*, 750 F.Supp.2d 189, 195-96 (D. Me. 2010) (finding ICCTA completely preempted claim for breach of recorded easement concerning railroad right-of-way); *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 544-45 (5th Cir. 2005) (finding ICCTA completely preempted non-contractual claims for injunctive relief that would interfere with railroad operations). Prayers for punitive damages, like Plaintiffs' here exceeding $100,000,000, independently support a finding of complete preemption. *S.D. ex rel. S.D. R.R. Auth.*, 280 F. Supp. 2d at 935 (finding ICCTA completely preempted claims for punitive damages and tortious interference).

52.    Because this case at its core is removable as completely preempted, remaining aspects (if any) also belong in federal court under the doctrine of supplemental jurisdiction. 28 U.S.C. §§ 1367(a), 1441(c).

19

53.    Accordingly, removal is proper pursuant to 28 U.S.C. § 1441 (a), (b), and (c).

## ADDITIONAL GROUNDS

54.    The Removing Defendants reserve the right to amend this Notice of Removal to assert additional grounds for federal jurisdiction, including but not limited to: (a) diversity jurisdiction under 28 U.S.C. § 1332(a), as further facts are developed through discovery or otherwise; and (b) fraudulent or improper joinder of one or more defendants, to the extent that any defendant has been joined solely to defeat federal jurisdiction and no reasonable basis exists for a claim against that defendant under applicable state law. The Removing Defendants expressly reserve all arguments regarding improper joinder, including but not limited to arguments that certain claims against co-defendants are wholly preempted by the ICCTA and therefore cannot support joinder for purposes of defeating federal jurisdiction.

**WHEREFORE**, Defendants CSX Transportation, Inc. and Florida Northern Railroad, LLC, by and through their respective undersigned counsel, respectfully remove this action now pending against them in the Circuit Court of the Fifth Judicial Circuit in and for Marion County, Florida, 26-CA-00407-AX, to the United States District Court for the Middle District of Florida, Ocala Division.

Date: June 10, 2026

Respectfully submitted,

/s/ *Lauren V. Purdy*
GUNSTER YOAKLEY & STEWART, P.A.

/s/ *Mark J. Criser*
Mark J. Criser (FBN 0141496)
Lead Counsel

20

David M. Wells
Florida Bar No. 0309291
Lauren V. Purdy
Florida Bar No. 93943
Rebecca A. Maturo
Florida Bar No. 1049429
1 Independent Drive, Suite 2300
Jacksonville, Florida 32202-5185
P: (904) 354-1980
F: (904) 354-2170
Primary: dwells@gunster.com
        lpurdy@gunster.com
        rmaturo@gunster.com
Secondary: dculmer@gunster.com
        jglus@gunster.com

*Attorneys for Defendant CSX Transportation, Inc.*

mark.criser@hwhlaw.com
regina.bigness@hwhlaw.com
Steven L. Cline (FBN 1010682)
steve.cline@hwhlaw.com
michelle.armstrong@hwhlaw.com
HILL WARD & HENDERSON, P.A.
101 East Kennedy Blvd.
Tampa, Florida 33602
Telephone:  (813) 221-3900
Facsimile:   (813) 221-2900

*Attorneys for Defendant Florida Northern Railroad, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 10, 2026, I electronically filed the foregoing with the Clerk of the Court by using the *CM/ECF* system and furnished the foregoing by electronic mail to: Simeon Genadiev, Esq., The G Law Group, P.A., (sgenadiev@theglawgroup.com).

<u>/s/ *Lauren V. Purdy*</u>
Attorney