<table>
<tr><td></td><td>IN THE CIRCUIT COURT OF THE<br>5TH JUDICIAL CIRCUIT IN AND FOR<br>MARION COUNTY, FLORIDA</td></tr>
</table>

CURTIS TRAMMELL, CHRISTOPHER
BRYANT CRABTREE, CYNTHIA
DEMOTT, DAVID DEMOTT, ARCHIE
PARSLEY, CHRISTOPHER ANDERSON,
RAINBOW RIVER KAYAK
ADVENTURES, LLC, on behalf of themselves
and all others similarly situated,

               Plaintiff(s),

vs.

CSX TRANSPORTATION, INC.,
FLORIDA NORTHERN RAILROAD
COMPANY, LLC, and TRACK LINE
RAIL, LLC,

               Defendant(s).

      CLASS REPRESENTATION

      CASE NO: 26CA000407AX

_____/

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, CURTIS TRAMMELL ("Mr. Trammell"), CHRISTOPHER BRYANT

CRABTREE ("Mr. Crabtree"), CYNTHIA DEMOTT ("Mrs. Demott"), DAVID DEMOTT ("Mr.

Demott"), ARCHIE PARSLEY ("Mr. Parsley"), CHRISTOPHER ANDERSON ("Mr.

Anderson") and RAINBOW RIVER KAYAK ADVENTURES, LLC ("Rainbow River Kayak")

(collectively referred to as "Plaintiffs") individually and on behalf of putative classes of all others

similarly situated, bring this Class Action Complaint and Demand for Jury Trial against

Defendants, CSX TRANSPORTATION, INC., ("CSX"), FLORIDA NORTHERN RAILROAD

COMPANY, LLC ("Florida Northern"), and TRACK LINE RAIL, LLC ("Track Line")

(collectively referred to as "Defendants"), and based on personal knowledge, investigation of

counsel, and review of public documents and information, alleges as follows:

## INTRODUCTION AND NATURE OF THE CLAIM

1.    This is a putative class action lawsuit that seeks redress for residents, property owners, employees, and businesses living, working, and/or located in and around the February 1, 2026, railroad tie fire that occurred in Marion County, Florida, and resulted in contamination of, and exposure to, toxic smoke, noxious odors, massive amounts of carcinogenic, volatile and semi-volatile organic compounds, including creosote, o-, m-, and p-cresols, particulate matter, nitrogen dioxide, carbon monoxide, sulfur dioxide, and other toxic chemicals and combustible materials (the "Railroad Tie Fire"[1]). As a result of the Railroad Tie Fire, the Classes (defined below) have all suffered, among other things, loss of use and enjoyment, property damage, diminution in value, exposure to hazardous material, disruption, loss of income, expenses, and economic damages as alleged more specifically below.

2.    Defendant CSX claims that it strives to be good neighbors to the City of Dunnellon, but for months, Defendant CSX ignored repeated requests from its neighbors to remove these railroad ties from the City of Dunnellon and Marion County, Florida, before the Railroad Tie Fire.

## THE PARTIES

3.    At all relevant times, Plaintiff, Curtis Trammell was an adult citizen of Florida and domiciled at the real property located at 7414 S Forte Evans Point, Homosassa, FL 34446.

4.    At all relevant times, Plaintiff, Curtis Trammell's principal place of employment was located at 2981 West Dunnellon Rd., Dunnellon, FL 34433, which is located within five (5) miles of the Railroad Tie Fire.

---

[1] The Railroad Tie Fire occurred at 20361 & 20365 E McKinney Avenue, Marion County, Florida, and the area between two sets of tracks east of North Williams Street and Robinson Road, in Dunnellon, Florida. The Railroad Tie Fire encompassed the following approximate coordinates: Latitude 29.058240, Longitude 82.452800 at the northern end to approximately Latitude 29.054930, Longitude 82.455480 at the southern end. Including coordinates: Latitude 29.05734°N; Longitude 82.45365°W.

5.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the Railroad Tie Fire and resulting toxic chemical exposure, Mr. Trammell has suffered damages, including, but not limited to, loss of income, and a significantly increased risk of cancer and other medical conditions from exposure to and inhalation of toxic chemicals, and contamination of his residence and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil, and water.

6.     Mr. Trammell seeks to represent the Resident Subclass and the Employee Subclass as defined below.

7.     At all relevant times, Plaintiff, Christopher Bryant Crabtree was an adult citizen of Florida and domiciled at the real property located at 17 West Lemon Street, Beverly Hills, FL 34465.

8.     At all relevant times, Plaintiff, Christopher Bryant Crabtree's principal place of employment was located at 2981 West Dunnellon Rd., Dunnellon, FL 34433, which is located within five miles of the Railroad Tie Fire.

9.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the Railroad Tie Fire and resulting toxic chemical exposure, Mr. Crabtree has suffered damages, including, but not limited to, loss of income, and a significantly increased risk of cancer and other medical conditions from exposure to and inhalation of toxic chemicals, and contamination of his residence and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil, and water.

10.     Mr. Crabtree seeks to represent the Resident Subclass and the Employee Subclass as defined below.

11.     At all relevant times, Plaintiff, Christopher Anderson was an adult citizen of Florida and the Manager of Rainbow River Kayak Adventures, LLC.

12.     Mr. Anderson is also the owner of real property at 11635 Osceola Road, Dunnellon, FL 34431, which is located within three (3) miles of the Railroad Tie Fire.

13.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the Railroad Tie Fire and resulting toxic chemical exposure, Mr. Anderson has suffered damages, including, but not limited to, loss of income, loss of enjoyment of use of the Rainbow River, loss of enjoyment of use of real property, diminution in value of real property, and a significantly increased risk of cancer and other medical conditions from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil, and water.

14.     Mr. Anderson seeks to represent the Resident Subclass, the Property Owner Subclass, and the Employee Subclass as defined below.

15.     At all relevant times, Rainbow River Kayak Adventures, LLC, operates a business located at 11463 N. Williams Street, Dunnellon, Florida 34432, that has provided kayak tours of the Rainbow River for the past fifteen (15) years.

16.     Rainbow River Kayak is located within one (1) mile of the Railroad Tie Fire.

17.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the Railroad Tie Fire and resulting toxic chemical exposure, Rainbow River Kayak has suffered a loss of business income and goodwill, and its business property has been

contaminated by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air, soil, and water.

18.    Rainbow River Kayak seeks to represent the Business Subclass as defined below.

19.    At all relevant times, Plaintiffs, Cynthia Demott and David Demott were adult citizens of Florida and the owners of real property at 9306 SW 192 Court Rd. Dunnellon, FL 34432, which is located within three (3) miles of the Railroad Tie Fire.

20.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the Railroad Tie Fire and resulting toxic chemical exposure, Mrs. Demott and Mr. Demott have suffered damages, including, but not limited to, loss of enjoyment of use of the Rainbow River, loss of enjoyment of use of real property, diminution in value of real property, and a significantly increased risk of cancer and other medical conditions from exposure to and inhalation of toxic chemicals, and contamination of their property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil, and water.

21.    Mrs. Demott and Mr. Demott seek to represent the Resident Subclass and the Property Owner Subclass as defined below.

22.    At all relevant times, Plaintiff, Archie Parsley was an adult citizen of Florida and resided at 11875 Rainbow Garden Circle, Apt. A, Dunnellon, FL 34432, which is located within two (2) miles of the Railroad Tie Fire.

23.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the Railroad Tie Fire and resulting toxic chemical exposure, Mr. Parsley has suffered damages, including, but not limited to, a significantly increased risk of cancer and other medical conditions from exposure to and inhalation of toxic chemicals, and contamination of his

residence by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil, and water.

24. Mr. Parsley seeks to represent the Resident Subclass as defined below.

25. Defendant CSX is a for-profit corporation with its principal place of business in Jacksonville, Florida.

26. Upon information and belief, Defendant CSX provides rail-based freight transportation services in the United States and Canada.

27. At all relevant times, Defendant CSX owned, operated, controlled, and/or maintained the property where the Railroad Tie Fire occurred.

28. At all relevant times, Defendant CSX acted individually, as well as, by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

29. Defendant Florida Northern is a Florida limited liability company with its principal place of business in Apopka, Florida.

30. Upon information and belief, Defendant Florida Northern is one of several short line railroads run by Regional Rail, LLC.

31. At all relevant times, Defendant Florida Northern operated 104 miles of track on two separate branch lines with one CSX interchange at Ocala and the other at Newberry, Florida, transporting lumber, metals, chemicals, paper, plastics, railroad ties, and energy products. Defendant Florida Northern offers transloading, warehousing, and logistics services.

32. At all relevant times, Defendant Florida Northern leased, controlled, operated, and/or maintained the short line railroad where the railroad ties were stored and the Railroad Tie Fire occurred.

33. At all relevant times, Defendant Florida Northern acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

34. Defendant Track Line is a Texas limited liability company with its principal place of business in Southlake, Texas.

35. Upon information and belief, Defendant Track Line provides various railway recycling services and provided such services to Defendant CSX and Defendant Florida Northern or engaged in such services on land owned by Defendant CSX and leased by Defendant Florida Northern with Defendant Florida Northern and Defendant CSX's knowledge and consent.

36. One of the railway recycling services that Defendant Track Line provides is grinding old railroad ties into a mulch used as fuel.

37. At all relevant times, Defendant Track Line owned thousands of creosote-treated railroad ties that burned in the Railroad Tie Fire on February 1, 2026, and thereafter.

38. Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation, any officer, director, employee, manufacturer, and/or supplier of Defendants who has knowingly and willfully aided, abetted, and/or conspired with respect to the Railroad Tie Fire and release of toxic/hazardous substances alleged herein.

## JURISDICTION AND VENUE

39. This is an action in which the amount in controversy, in the aggregate, exceeds the sum of Fifty Thousand Dollars ($50,000), exclusive of interest, costs, and attorney's fees.

40. This Court has personal jurisdiction over Plaintiffs, because Plaintiffs submit to the Court's jurisdiction.

41.     This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes §48.193(1)(a)1, §48.193(1)(a)2, §48.193(1)(a)6, and §48.193(1)(a)7, because they conduct and carry on substantial business in the State of Florida, own or lease real property in the State of Florida, committed a tortious act within the State of Florida, caused injury to persons and property within the State of Florida, and the actions giving rise to the Complaint took place in the State of Florida.

42.     Venue is proper in this Court pursuant to Florida Statute §47.051, because the cause of action, Defendants' breach of their duties, and Defendants' gross negligence that affected Plaintiffs and the Class occurred in this venue.

43.     All conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

## FACTUAL ALLEGATIONS

44.     Railroad ties are large wooden beams that hold railroad tracks in place. Almost all railroad ties used in the United States are treated with a chemical called creosote, which, among other things, helps keep wood from rotting. Creosote is a variable mix of over 300 chemical compounds, including polycyclic aromatic hydrocarbons ("PAHs"), many of which are classified by the U.S. Environmental Protection Agency ("EPA") as known or probable human carcinogens.

45.     When railroad ties are pulled from service, due to issues like age, deterioration, or track upgrades, they must be disposed of. The standard disposal methods are dumping at landfills or burning at specified waste-to-energy facilities. The toxicity of creosote makes both of these disposal methods, landfill and incineration very expensive due to heavy safety regulations. To save money, some rail operators have begun grinding railroad ties into wood chips or mulch for fuel. Railroad tie grinding is a method that dramatically lowers disposal costs but may increase

the environmental and health risks associated with creosote as grinding breaks the ties apart and releases creosote into the surrounding air, water, and ground. Railroad tie grinding operations are typically done in specialized industrial facilities that are fully enclosed, in order to stop the toxic chemical-laden dust from escaping.

46.     Upon information and belief, Defendants CSX and/or Florida Northern engaged or permitted Defendant Track Line to grind railroad ties for disposal.

47.     The original planned site for Defendant Track Line's railroad tie grinding operation was in Newberry, Florida.

48.     On or about October 2024, Newberry first held a pre-application meeting with Defendant Track Line outlining what steps Defendant Track Line was required to take to comply with operation and permit standards.

49.     On or about December 2024, Stacey Hectus, Newberry's Director of Community Development, informed Defendant Track Line that it was required to apply for a site and development plan, because the grinding operation was considered an industrial development in the city of Newberry.

50.     On or about January 2025, Track Line Rail, LLC, moved into land near Northwest 5th Avenue and U.S. Route 41 in Newberry, Florida for the purposes of setting up the railroad tie grinding operation. and immediately began grinding the railroad ties in the open air, outdoors, and uncovered, without any city, county, or state permits despite being aware they were required. Defendant Track Line did not so much as submit a site and development plan to the city or county prior to moving, storing, or grinding the railroad ties in Newberry.

51.     On or about February 2025, Newberry held another pre-application meeting with Defendant Track Line and its contractor JBPro who had been commissioned to design the site and

development plan. Upon information and belief, at this meeting Defendant Track Line's employee Trent Marshall confirmed that Track Line had already been stockpiling and grinding railroad ties without permits or approvals.



52.     On April 11, 2025, Newberry officials placed a stop-work order on Defendant Track Line's operations because it missed a deadline to submit a site development plan for proper permitting. Although Defendant Track Line had none of the permits from the city, county or state it knew it needed, and despite the stop-work order, the grinding and stockpiling of ties did not stop immediately.

53.     On or about April 2025, multiple landowners in Newberry lodged complaints regarding dust and fumes blowing onto their lots as a result of Track Line grinding railroad ties.

54.     On May 6, 2025, Alachua County issued its own cease-and-desist order to Defendant Track Line for reasons inclusive of allowing discharge of hazardous material into soils,

air, groundwater, and/or surface waters. This order from Alachua County was in addition to the stop work order in effect from the City of Newberry. On May 6, 2025, Alachua County and the City of Newberry gave Track Line's Shane Brooks notices to correct violations stemming from Track Line's railroad tie grinding operation and comply with the stop work order.

55.    On May 13, 2025, the City of Newberry held an appeals hearing on its stop work order. Newberry's commissioners voted unanimously to deny the appeal and uphold Alachua County's cease and desist order.

56.    On May 18, 2025, Newberry City Council held a special meeting where Defendant Track Line's Chief Executive Officer, Dave Malay, acknowledged that he had begun grinding railroad ties without a permit and had continued grinding railroad ties even after the April 11, 2025, stop-work order. Dave Malay stated that he planned to set up two, 40-foot containers on the site under a dome to capture the dust from grinding, however, he started the grinding in the outdoors, open air without any such containers.

57.    The Florida Department of Environmental Protection ("FDEP") conducted an analysis of Defendant Track Line's grinding operations in Alachua County and found high levels of some volatile organic compounds ("VOCs") that were of concern to health and the environment.

58.    Despite requiring Defendant Track Line to clean up the Newberry site before leaving, Alachua County and the FDEP – Northeast District, were left with the cleanup of the hazardous materials and debris Defendant Track Line left in Newberry.  This required Alachua County, at its own cost, to remediate the site by scraping, removing, and transporting approximate 6 inches of soil on portions of a 17.5-acre site to safely dispose of it.

59.    Following Defendant Track Line's cessation of its grinding operations as required by the City of Newberry and Alachua County, Defendant Track Line, without any notice to Marion

County or the City of Dunnellon, relocated the creosote-treated railroad ties from Alachua County to property located at and adjacent to real property located at 20361 and 20365 E. McKinney Avenue, Dunnellon, Florida in Marion County, and any of the surrounding area between two sets of tracks east of North Williams Street and Robinson Road, in Dunnellon, Florida which are owned by Defendant CSX and leased by Defendant Florida Northern (the "Property"). The Property consists of three adjacent parcels, one that is located entirely within the City of Dunnellon, one that is located entirely within Marion County, and one that is split between both the City of Dunnellon and Marion County.

60.     On or about June and July 2025, despite Defendant Track Line's prior knowledge that its railroad tie operations were already considered offensive by its neighbors, that local governments require permitting and specifically control zoned activities and land use, Defendant Track Line, without so much as a call to Marion County or the City of Dunnellon, unloaded several hundred tons of the creosote-treated railroad ties between two residential communities (Chatmire and Blue Cove), onto the Property.

61.     The Property is less than one (1) mile from natural springs and the Rainbow River which is designated by the State of Florida as a protected Class III waterbody and explicitly designated on the Federal Section 303(d) list of impaired water bodies necessitating heightened oversight.

62.     In August 2025, Defendant Track Line submitted its application for an air pollution permit for the Property to the FDEP ("Track Line's Air Pollution Application") as it was planning to resume operations involving the grinding and/or shredding of creosote-treated railroad ties.

63.     On September 8, 2025, Defendant Track Line submitted its Notice of Intent to Use Multi-Sector Generic Permit ("MSGP") for Stormwater Discharge Associated with Industrial

Activity to FDEP. FDEP processed the permit the same day without review, per its automated process assigning an effective date of September 11, 2025. *See* **Composite Exhibit A** at p.1.

64. As a condition of the MSGP Defendant Track Line was required to implement a Stormwater Pollution Prevention Plan, to implement appropriate Best Management Practices, to conduct and document routine inspections, to retain certain records at the facility, and to conduct required monitoring.

65. Upon information and belief, Defendant CSX had knowledge of and consented to Defendant Track Line's relocation to the Property despite its proximity to the Rainbow River for Track Line's railroad tie grinding and shredding operation after enforcement actions forced Defendant Track Line out of Alachua County.

66. Upon information and belief, Defendant Florida Northern had knowledge of and consented to Defendant Track Line's relocation to the Property despite its proximity to the Rainbow River for Track Line's railroad tie grinding and shredding operation after enforcement actions forced Defendant Track Line out of Alachua County.

67. As none of the Defendants coordinated or communicated with local officials regarding the relocation, it was only after receiving the Public Notice in mid-October, 2025, (a condition of FDEP Air Pollution Construction Permit Application), that City of Dunnellon and Marion county officials first became aware that a non-railroad organization, Defendant Track Line, was planning on creating a railroad tie shredding and grinding facility that was similar to the one that had just been shut down a few months prior by the City of Newberry and Alachua County.

68. By October 2025, high mounds of railroad ties stretched approximately 500 feet along Florida Northern's tracks, on land owned by CSX, unprotected on the ground less than 1,000 feet from the Rainbow River.



69.    On October 22, 2025, the Dunnellon City Council voted to oppose Defendants planned air-pollution permit and grinding of railroad ties at the site of the Railroad Tie Fire, because based on Defendant Track Line's own expected annual emissions of 58.77 tons of particulate matter ("PM"), 67.22 tons each of nitrogen oxides and carbon monoxide, and 23.95 tons of sulfur dioxide, along with volatile organic compounds, and 33.47 tons of fine PM ("PM10") and 20.83 tons of extremely fine PM ("PM 2.5") could directly affect Marion County residents and the Rainbow River.

70.    On October 24, 2025, Marion County Code Enforcement issued a Notice of Violation to Defendants CSX and Track Line requiring that no grinding or shredding of the railroad ties occur, that no additional railroad ties be brought onto the Property, and ordering Defendant CSX and Defendant Track Line to remove the stockpile of railroad ties, citing accumulation of junk and prohibited industrial use on agricultural land, giving them until November 11, 2025, before reinspection.

71.    During a special Dunnellon City Council meeting on October 27, 2025 ("Oct 27 Special Council Meeting"), a letter that was submitted to FDEP by Florida State Representative, JJ Grow ("Representative Grow"), was read into the record.

72. Representative Grow strongly opposed Track Line and CSX's permit for a railroad tie grinding facility based on the "irreversible impacts on air quality, water quality, and overall community well-being."

73. During the Oct 27 Special Council Meeting many residents and conservation groups detailed the serious public health risks associated with Defendants storing, maintaining, and grinding the creosote-treated railroad ties. For example, in addition to the odors being emitted by storing the railroad ties outdoors in an unsecured area, residents noted that grinding of the creosote-treated railroad ties would lead to the release of arsenic, formaldehyde, sulfur dioxide, nitrogen oxide, carbon dioxide, and VOCs.

74. One of the major objections to Defendant Track Line's plans to grind railroad ties at the site of the Railroad Tie Fire was the location of the operation, which was within half a mile of the Rainbow River. At this distance, any water misters used to control the dust from the grinding operation would create particle-laden runoff that would seep into the soil, contaminating the aquifer and the Rainbow River.

75. The day after the Oct 27 Special Council Meeting, the City of Dunnellon issued a separate Notice of Violation to Track Line and CSX stating that they were in violation of city code and state statutes.

76. The City of Dunnellon also ordered the railroad ties to be removed by November 14, 2025.

77. On October 29, 2025, Marion County Code Enforcement contacted CSX and requested access to the site of the Railroad Tie Fire.

78.    On October 30, 2025, the Marion County Board of Commissioners sent FDEP a letter opposing Project No. 0830196-001-AC and the air pollution permit application submitted by Track Line ( the "Marion County's Opposition to Air Pollution Permit").

79.    Neither CSX nor Track Line responded to Marion County's October 24 Notice of Violation or comments in Marion County's Opposition to Air Pollution Permit. Instead, additional railroad ties were brought by Defendants onto the Property and none of the existing railroad ties were removed from the Property.

80.    In November 2025, Marion County had several telephone calls with Florida Northern Railroad's General Manager and Property Manager regarding the railroad ties at the Property.

81.    On November 6, 2025, Marion County issued its second notice of continuing violations, notice of additional violation, cease and desist and stop work order, and a first notice demanding abatement of nuisance to Defendant CSX, Defendant Track Line and Defendant Florida Northern (the "November 6 Notice").

82.    The November 6 Notice specifically stated that Defendants were not permitted to grind or shred railroad ties, bring any additional railroad ties on the Property and were required to **immediately** remove the stockpiles of railroad ties from the Property.

83.    The November 6 Notice stated that the Property would be re-inspected on November 17, 2025, to ensure all violations had been cleared.  On November 17, 2025, the Property was inspected again, and it was found that thousands of creosote-treated railroad ties remained on the Property, completely open, obvious, exposed, and susceptible to the elements.

84.    On November 18, 2025, Marion County sent a third notice of violation to Defendants along with a cease-and-desist and stop work order, and a second notice of demanding

abatement of nuisance again requiring, among other things, that the stockpiles of railroad ties existing on the Property be immediately removed.

85.     While Defendant Track Line persisted in failing to communicate or respond to Marion County, representatives for both Defendant CSX and Defendant Florida Northern assured Marion County that no additional railroad ties would be brought onto the Property and no grinding or shredding of the railroad ties would occur. However, the excessive stockpiles of thousands of tons of creosote-treated railroad ties brought to the Property remained on the Property well beyond both Marion County and Dunnellon's compliance dates.  Marion County engaged in extensive negotiations with a representative from Defendant CSX concerning removal of the thousands of tons of creosote-treated railroad ties.

86.     On December 4, 2025, in an email, Assistant Marion County Attorney told Defendant CSX that the railroad ties presented an "extremely concerning" fire hazard, and provided Defendant CSX with a copy of Marion County Fire Chief James Banta's ("Fire Chief Banta") letter to the Mayor of Dunnellon regarding the specific fire hazards associated with storing these railroad ties at the Property. *See* **Composite Exhibit "B"** at p. 1-2.

87.     In the December 4, 2025, letter, Fire Chief Banta warned that:

"Creosote-treated railroad ties create a unique type of incident. A fire involving these materials is not a standard wood fire. Creosote behaves more like a petrochemical, burning extremely hot, producing heavy black smoke, and **generating contaminated runoff capable of polluting soil and waterways.** If these ties ignited, MCFR would immediately be forced into a series of challenging tactical decisions.  One of the most difficult decisions would be determining whether to aggressively extinguish the fire or allow it to burn under control. Aggressive suppression would require very large volumes of water and foam, **producing contaminated runoff that could easily reach stormwater systems, wetlands, and ultimately the Rainbow River watershed."** *See Id.* at p. 8.

88.     In addition to concerns about the ability to suppress a petrochemical fire, Fire Chief Banta was critically concerned about firefighter health and safety as "burning creosote releases

toxic vapors and particulates", which requires the use of self-contained breathing apparatus and decontamination procedures, while still containing significant long-term exposure risks. *See* **Composite Exhibit "B"** at p. 8.

89. Fire Chief Banta specifically warned that "[t]he railroad ties, **as stored now, present an extremely high fire load** in a location where access becomes limited once a fire is fully involved." *See Id.* at p. 9.

90. On December 4, 2025, Defendant CSX announced that the railroad ties would be removed from the Property within a week.

91. Yet despite this promise and despite the clear and significant risks highlighted in Fire Chief Banta's letter, Defendant CSX failed to take any action to remove the railroad ties from the Property.

92. On December 10, 2025, Defendant CSX sent Marion County an email confirming that Defendant Track Line would load the railroad ties onto Defendant CSX's rail cars for prompt removal out of the state "as early as this week." *See* **Composite Exhibit "B"** at p. 1.

93. On December 15, 2025, (over one month after both Marion County and Dunnellon's initial removal deadlines) the environmental specialists from FDEP conducted a comprehensive physical on-site and digital file compliance inspection of Defendant Track Line's facility on the Property and officially rated the facility as "Out of Compliance." *See* **Exhibit "C"**.

94. Specifically, FDEP investigators discovered unconfined black particulate matter escaping from the facility boundaries along the railroad tracks and surface pathways, actively migrating off-site into surrounding low-lying areas and sensitive wetland systems feeding the impaired Rainbow River (Blue Run) a highly prioritized spring-fed system. *See Id.* at p. 4, 5, 12, 13, and 14.

95.     More concerningly, in its mandatory Stormwater Pollution Prevention Plan ("SWPPP") filed with the State of Florida, Defendant Track Line materially misstated environmental details by falsely asserting that its facility does not discharge into an impaired water body. FDEP verified this statement was patently false as the facility's runoff flows directly into the highly protected and impaired Rainbow River. *See Id.* at p. 6.

96.     FDEP inspectors documented that Defendant Track Line was operating entirely outside its authorized site configurations, establishing vast, unmapped material stockpiles, loading/unloading zones, and potential unauthorized stormwater outfalls across the southern portion of the 66-acre property.[2]  None of these industrial zones or discharge pathways were disclosed, mapped, or approved in the facility's regulatory filings. *See Id.* at p. 5.

97.     The findings included that Defendant Track Line failed to implement mandatory Best Management Practices ("BMPs") for the containment of outdoor material stockpiles. Large piles of creosote-treated railroad ties were left entirely exposed to precipitation for such an extended period that heavy, unmanaged vegetation had grown around them, creating an uncontained source of creosote-laden stormwater runoff. *See Id.* at p. 5.

98.     Defendant Track Line also failed to implement mandatory Good Housekeeping BMPs for chemical storage required to protect surface and groundwater. Specifically, FDEP inspectors discovered a used oil drum stored outdoors on pervious ground, completely uncovered, unsheltered, and left exposed to rainfall in direct violation of the facility's own SWPPP. FDEP inspectors documented that the chemical drum was visibly corroded, indicating a significant length of time exposed to precipitation. *See Id.* at p. 5 and 17.

---

[2] Stretching from approximately 29°03'40.5" N 82°27'00.4"W to 29°03'17.4" N 82°27'21.2"W.

99.    Defendant Track Line failed to design or implement the mandatory operational controls required under the MSGP.  The SWPPP entirely omitted required narrative summaries identifying potential pollutant sources at its loading, unloading, and waste disposal zones. The SWPPP also failed to include a legally required non-stormwater discharge evaluation and certification, and failed to incorporate an emergency response schedule designed to limit the tracking and spreading of spilled hazardous materials across the site. *See* **Exhibit "C"** at p. 8.

100.    FDEP also found that Defendant Track Line failed to maintain or produce any required regulatory documentation, including routine inspection logs, preventive maintenance reports, and employee environmental safety and training records.  In fact, on December 15, 2025, a designated facility representative for Defendant Track Line openly admitted that the mandatory inspections were not being conducted. *See Id.*

101.    FDEP found several other violations as well and formally charged Defendant Track Line with multiple Single Event Violations. *See Id.* at p. 10.

102.    While on-site, FDEP discovered the Property was also being used for railroad transportation and freighting operations which exceeded the scope of the existing permit which was specifically for timber products. *See Id.* page 4. The railroad transportation and freighting operations on the Property are executed by Defendant Florida Northern and Defendant CSX. These specialized rail freighting operations independently trigger mandatory permit coverage under Sector P (Land Transportation) of the Multi-Sector Generic Permit. *See Id.* Despite the high-risk nature of operating rail transportation directly adjacent to sensitive wetland systems, neither Defendant Florida Northern nor Defendant CSX obtained the required permits or followed the applicable regulations.  *See* **Exhibit "C"** page 4.

103. The wholesale failure of Defendant CSX and Defendant Florida Northern to apply for, obtain, and implement the necessary Sector P stormwater permits mirrors Defendant Track Line's own pattern of environmental non-compliance and a reckless disregard for the legal protections enacted to safeguard the Class III, impaired waters of the Rainbow River.

104. On January 6, 2026, Defendant CSX confirmed that while additional rail cars were sent to the site of the Railroad Tie Fire, none of the Defendants had removed the railroad ties. Defendant CSX could not provide a completion date for removal of railroad ties despite stating over a month prior they would be removed within a week.

105. Defendant CSX reported there were 110,000 railroad ties stored on the Property.

106. On January 7, 2026, FDEP issued a formal Compliance Assistance Offer to Defendant Track Line's Chief Executive Officer, Dave Malay, notifying Defendant Track Line that its pervasive operational deficiencies constituted actionable non-compliance with the requirements of Florida law and providing thirty (30) to respond ("FDEP's January 7th Compliance Assistance Offer"). *See* **Exhibit "C"** at p. 1.

107. Upon information and belief, none of the Defendants responded to FDEP's Compliance Assistance Offer.

108. Marion County continued to communicate with Defendant CSX (as Defendant Track Line was completely non-responsive) throughout January 2026, reaffirming Marion County's position that the railroad ties need to be removed by a firm deadline. Defendant CSX could not commit to deadline for removal.

109.    On February 1, 2026, around 2:45 a.m., a large fire broke out involving thousands of creosote-treated railroad ties.[3]





---

[3] Blue Cove residents reported the fire of the railroad ties was approximately 30 feet from their homes. The Comfort Suites located at 20052 Brooks Street, Dunnellon, Florida was evacuated due to the proximity of the Railroad Tie Fire.

110. The Railroad Tie Fire released large plumes of thick, noxious black smoke, smoldering ashes, and pieces of railroad ties for miles.

111. Marion County's fire rescue, sheriff's office and emergency management were immediately deployed, as well as multiple agencies who later arrived on scene, inclusive of Florida Forest Service, FDEP, Florida Department of Emergency Management, the Florida Department of Health, and the Florida Department of Agriculture and Consumer Services. All agencies worked for many hours to contain the fire burning through stockpiles of creosote-treated railroad ties located on the Property.

112. It took seven (7) fire engines, one (1) tower, eight (8) grass trucks, three (3) tankers, nineteen (19) fire suppressions units, and fifty-four (54) firefighters to even get the fire under control.



113. The day of the Railroad Tie Fire, the City of Dunnellon issued a temporary local state of emergency, to remain in effect for seven (7) days, advising residents to activate emergency management preparations, limit outdoor activities, and keep windows and doors closed.

114. Residents in Dunnellon and neighboring areas complained of foul odors and low visibility for days.

115. The burn site continued smoldering and releasing toxic smoke, noxious odors, PM, PM10, PM2.5, and various chemicals including o-, m-, and p-cresols, nitrogen dioxide, carbon monoxide, VOCs, semi-volatile organic compounds ("SVOCs"), sulfur dioxide, and other toxic chemicals for days after the Railroad Tie Fire commenced.

116. State Representative Grow released a statement that the fire was also being treated as a potential environmental and public health incident due to toxic smoke and contamination risks.

117. On February 2, 2026, Marion County Code Enforcement inspected the Property and found no ties had been removed from the Property since Marion County Code Enforcement's last inspection.

118. On February 3, 2026, Marion County issued a seven-day Declaration of Local State Emergency as a result of the Railroad Tie Fire, implementing all emergency powers and restrictions necessary for the preservation of the health, welfare, and safety of the people in Marion County.

119. On February 3, 2026, the fire was finally extinguished.

120. While it is known that many of the creosote-treated railroad ties have burned, over one (1) month after the Railroad Tie Fire there still remained many additional stockpiles of creosote-treated railroad ties on the Property, as well as potential pollutants and hazardous materials resultant of the stockpiles being exposed to weather, as well as the Railroad Tie Fire and its extinguishment.

121. Marion County was forced to file an injunction against Defendants in an effort to have the railroad ties removed, which is still pending.

122. Creosote is classified by the EPA as a Group B1 Probable human carcinogen. Several case reports of human carcinomas associated with exposure to creosote have been published.

123. The EPA classifies about one-third of the chemicals within creosote as "high priority pollutants" because of their toxicity, prevalence and persistence.

124. Acute exposure to coal tar creosote, coal tar, coal tar pitch or coal tar pitch volatiles can result in increased sensitivity to sunlight, damage to the cornea, and skin damage such as reddening, blistering, or peeling.

125. Acute exposures to the vapors of the creosotes, coal tar, coal tar pitch, or coal tar pitch volatiles can also cause irritation of the respiratory tract.

126. When creosote is exposed to weather conditions during outside storage, creosols are released into the air from the railroad ties.

127. This release of creosols into the air can cause irritation of the nose, mouth, throat, and lungs, causing discomfort and difficulty breathing. In severe cases, inhaling or ingesting large amounts of creosote can lead to poisoning, convulsions, persistent coughing and wheezing, chronic bronchitis, asthmatic attacks, permanent scarring and damage to lung tissue, resulting in conditions such as chronic obstructive pulmonary disease ("COPD"), and even death.

128. Air contamination with creosote can also cause a significantly increased cancer risk in several tissues including the respiratory tract, skin, lung, pancreas, kidney, bladder and central nervous system.

129. Class members have experienced symptoms after breathing the noxious fumes, and such symptoms are consistent with exposure to creosote and the hazardous compounds released as a result of the Railroad Tie Fire.

130.    Such exposure creates a significantly increased risk of contracting latent disease(s), the risk of which is greater than if Class members had not been exposed to said chemicals and pollution, and greater than the risk of members of the public at large developing such disease(s) who have not been exposed to the chemicals involved herein.

131.    Any burning of railroad ties treated with creosote causes noxious odors, PM, PM10, PM2.5, and various chemicals including o-, m-, and p-cresols, nitrogen dioxide, carbon monoxide, VOCs, SVOCs, sulfur dioxide, and other potential constituents into the air, land, and water.

132.    Exposure to burning creosote can lead to respiratory distress, loss of consciousness, pulmonary edema, irritation of the upper respiratory tract, and irritation of exposed skin.

133.    Creosote released from improperly stored railroad ties leaches into surrounding soil, where it persists for years due to the slow biodegradation of high-molecular weight PAHs. Residents and property owners exposed to creosote-contaminated soil will face disease risk through two pathways: dermal absorption and incidental ingestion. Skin contact with creosote or creosote-treated materials has been found to cause skin irritation, vesicular and papular skin eruptions, abnormal skin pigmentation, gangrene, and skin cancers. Beyond skin effects, PAHs absorbed through the skin or ingested, can enter the bloodstream and have been linked to liver and kidney damage.

134.    Creosote can dissolve in water and move through soil into groundwater, where it may persist for many years before breaking down. Residents who drink, cook with, or bathe in creosote-contaminated water are exposed to PAHs and phenolic compounds through ingestion, during bathing, and through dermal absorption. Under the EPA's Guidelines for Carcinogen Risk

Assessment, benoz[a]pyrene, a primary component of creosote, is classified as "carcinogenic to humans" and is one of the most regulated of the PAHs in drinking water.

135. Exposure to PAHs through drinking water is associated with bladder cancer, lung cancer, and skin cancer, as well as cardiovascular conditions, reproductive effects, endocrine disruption, and impairment of cognitive function.

136. Businesses disposing of creosote-treated wood must comply with the Resource Conservation and Recovery Act ("RCRA"), including hazardous-waste determinations.

137. Based on representations made by Defendant CSX to Marion County's Attorneys, Defendant Track Line was the owner of the thousands of creosote-treated railroad ties stored near homes and the Rainbow River.

138. Defendant CSX owned the Property where the Railroad Tie Fire occurred, and the creosote-treated railroad ties were stored.

139. At all times relevant hereto, Defendant CSX knew or should have known that the creosote-treated railroad ties involved in the Railroad Tie Fire were being stored on property that Defendant CSX owned.

140. Defendant Florida Northern leased the property where the Railroad Tie Fire occurred, and the creosote-treated railroad ties were stored.

141. At all times relevant hereto, Defendant Florida Northern knew or should have known that the creosote-treated railroad ties involved in the Railroad Tie Fire were being stored on property that Defendant Florida Northern was leasing.

142. On December 4, 2025, Defendant CSX was in possession of Fire Chief Banta's letter regarding the fire hazard presented by the improperly stored creosote-treated railroad ties that were subsequently involved in the Railroad Tie Fire less than two (2) months later.

143. Defendant CSX either shared or should have shared Fire Chief Banta's December 4, 2025, letter with Defendant Florida Northern and Defendant Track Line.

144. The last sentence of Fire Chief Banta's letter reads as follows: "[m]y responsibility is to protect life, property, and the environment, and in this case, **all three are put at unnecessary risk by the continued storage of creosote-treated [rail] ties.**" *See* **Composite Exhibit "B"** at p. 9.

145. Defendants intentionally or with reckless and wanton disregard ignored Fire Chief Banta's December 4, 2025 letter. As a result of their non-action, Defendants caused the Railroad Tie Fire.

## CLASS REPRESENTATION ALLEGATIONS

146. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

147. Plaintiffs bring this consolidated action pursuant to Florida Rules of Civil Procedure 1.220(a), 1.220(b)(2), and 1.220(b)(3) on behalf of themselves and the following class of persons and organizations similarly situated for all direct, proximate, and foreseeable losses caused by the Railroad Tie Fire and resulting toxic chemical contamination of the air, water, and soil. The proposed Classes are hereby defined as follows:

148. *The Residents Class Definition.* Defendants have engaged in the same conduct with respect to many other individuals. Mr. Trammell, Mr. Crabtree, Mrs. Demott, Mr. Demott, Mr. Parsley, and Mr. Anderson bring this action on behalf of all individuals who resided within a 30-mile radius of the Railroad Tie Fire site located in Marion County, Florida, from February 1, 2026, to the present.

149.    ***The Property Owners Class Definition.*** Defendants have engaged in the same conduct with respect to many other individuals and organizations.  Mr. Anderson, Mrs. Demott, and Mr. Demott bring this action on behalf of all individuals or legal entities who owned or otherwise had a legal interest in real property located within a 30-mile radius of the Railroad Tie Fire site located in Marion County, Florida, from February 1, 2026, to the present.

150.    ***The Employees Class Definition.*** Defendants have engaged in the same conduct with respect to many other individuals.  Mr. Crabtree, Mr. Trammell, and Mr. Anderson bring this action on behalf of all individuals who worked within a 30-mile radius of the Railroad Tie Fire site in Marion County, Florida, from February 1, 2026, to the present.

151.    ***The Business Class Definition.*** Defendants have engaged in the same conduct with respect to many other businesses and organizations.  Rainbow River Kayak brings this action on behalf of all individuals or legal entities who owned or operated a business located within a 30-mile radius of the Railroad Tie Fire site in Marion County, Florida, from February 1, 2026, to the present.

152.    Excluded from the Class(es) are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class(es); and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the Railroad Tie Fire and resulting toxic chemical contamination, arise out of a right of subrogation, whether equitable, contractual or otherwise.

153.    Also excluded from the Class(es) are any claims of physical manifestation of personal or bodily injury.

154.    Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct additional investigation and discovery.

155.    The multiple Classes all involve identical factual issues and common, if not identical, legal issues.

156.    The proposed Class(es) meet(s) the criteria for certification under Rules 1.220(a), 1.220(b)(2), and/or 1.220(b)(3).

157.    **Numerosity and Ascertainability**. This action satisfies the requirements of Fla. R. Civ. P. 1.220(a)(1). The members of the Class are so numerous that the joinder of all members is impractical.

158.    While the exact number of Class Members is unknown to Plaintiffs at this time, it is ascertainable; the proposed Class includes thousands of individuals and organizations who were unlawfully exposed to creosote and other toxic chemicals or who had property contaminated by unlawful exposure to creosote and other toxic chemicals and suffered damages. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

159.    **Commonality**. This action satisfies the requirements of Fla. R. Civ. P. 1.220(a)(2) and 1.220(b)(3) because this action involves common questions of law and fact that predominate over questions affecting only individual Class Members.

160.    The common questions of law and fact, which predominate over any questions affecting individual Class members, include, without limitation:

    a.    Whether Defendants' acts or omissions as set forth herein caused or contributed to the Railroad Tie Fire, subsequent release of toxic chemicals,

resulting contamination and state of emergency declared by the Marion County commissioners;

b. Whether Defendants breached their duty of reasonable care by openly storing hazardous creosote-treated railroad ties in Marion County, Florida, that were left exposed to weather conditions and the elements;

c. Whether Defendants are strictly liable for damages suffered by Plaintiffs and the Classes because Defendants engaged in abnormally dangerous and/or ultrahazardous activity by storing hazardous materials that were left exposed to weather conditions and the elements;

d. Whether Defendants are strictly liable for injuries and damages suffered by Plaintiff(s) and the Classes because Defendants engaged in abnormally dangerous and/or ultrahazardous activity when creosote-treated railroad ties were stored in a residential community and within half a mile from the Rainbow River;

e. Whether Defendants violated Florida's public nuisance law by emitting carcinogenic air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable damage to property;

f. Whether Defendants created a private nuisance through their acts and omissions, including by storing, maintaining, and/or burning railroad ties in an outdoor residential area near the Rainbow River;

g. Whether Defendants created a public nuisance through their acts and omissions, including by storing, maintaining, and/or burning railroad ties in an outdoor residential area near the Rainbow River;

h. Whether Defendants committed trespass on the property of Plaintiff(s) and the Classes by their acts and omissions, including by causing hazardous materials to enter and contaminate said property;

i. Whether Defendants committed trespass to the chattels of Plaintiffs and the Classes through their acts and omissions, including by impairing the property as to its condition, quality, or value; depriving Plaintiffs and the Classes of the possession or use of their chattels for a substantial time; or causing harm to the property;

j. Whether Defendants destroyed the vines, bushes, trees, crops, and/or other property of Plaintiffs and the Classes by the entry or intrusion of hazardous materials and/or fire without privilege or permission in violation of Florida law;

k. Whether Defendants affirmatively destroyed physical evidence, documents, or other materials and/or failed to act timely or reasonably to suspend any automatic processes that would result in such destruction;

l. Whether Defendants' acts and omissions caused businesses in the Class to suffer loss of income, lost profits, diminution of value, out-of-pocket expenses, and other legal damages as a result of the Railroad Tie Fire;

m. Whether Defendants' acts and omissions caused or contributed to losses and damages sustained by Plaintiffs and the Classes;

n. Whether the Plaintiffs and the Classes have suffered a loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or other economic damages as a result of the Defendants' acts or

omissions as set forth above;

o. Whether Plaintiffs' and the Classes have suffered a loss of income;

p. Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct, including related to the fire and subsequent release of creosote and other toxic and hazardous substances;

q. Whether medical monitoring is an appropriate remedy that should be imposed to provide early detection of future injuries and other benefits to Plaintiffs and the Classes;

r. Whether monitoring of the diminution in value of property, including the stigma, on the value of the property of Plaintiffs and the Classes is an appropriate remedy; and

s. Whether Plaintiffs and the Classes are entitled to relief for the damages caused by Defendants.

161. **Typicality**. This action satisfies the requirements of Fla. R. Civ. P. 1.220(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

162. At all relevant times, Plaintiffs own property, reside in, work, and/or operate businesses within the Class Zone surrounding the Railroad Tie Fire and toxic chemical contamination.

163. Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

164. Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

165. Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

166. **Adequacy**. This action satisfies the requirements of Fla. R. Civ. P. 1.220(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs have retained counsel with experience in prosecuting complex class actions and environmental tort litigation.

167. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

168. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members

169. **Superiority and Predominance**. This action satisfies the requirements of Fla. R. Civ. P. 1.220(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct predominate over any questions affecting only individual Class Members.

170. Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. Moreover, the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fla. R. Civ. P. 1.220(b)(3)(A).

171.    The prosecution of this case as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public, making class adjudication superior to other alternatives, under Fla. R. Civ. P. 1.220(b)(3)(D).

172.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 1.220 provides the Court with authority, discretion, and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify multistate classes for claims sharing common legal questions; utilize the provisions of Rule 1.220(d)(1) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 1.220(d)(4)(B) to divide any Class into subclasses.

## MEDICAL MONITORING CLASS INJUNCTIVE RELIEF PURSUANT TO RULE 1.220(b)(2)

173.    In addition, Plaintiffs satisfy the requirements for maintaining a class action under Rule 1.220(b)(2). Defendants have acted and failed to act on grounds generally applicable to Plaintiff(s) and the Classes and that require court imposition of uniform relief, thereby making appropriate equitable relief to the Classes as a whole within the meaning of Rule 1.220(b)(2).

174.    As set forth above, Plaintiffs are not asserting damages claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

175. Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

176. As a direct and proximate result of Defendants' wrongful conduct as set forth above, Plaintiffs and the Class Members have actually been exposed, and will continue to be exposed to toxic substances, toxic fumes, toxic dust, PM, VOCs, SVOCs, and carcinogens and thereby suffer, and will continue to suffer a significantly increased risk of serious injury and diseases as alleged herein, including liver disease such as liver cancer and angiosarcoma of the liver, cancers such as lung, skin, pancreas, kidney, bladder, prostate, rectal, and significant reproductive damage. This increased risk is such that a reasonable physician would order medical monitoring, including but not limited to periodic diagnostic medical testing and necessary examinations.

177. As Marion County recognized in connection with the Local State of Emergency declared on February 3, 2026, the health risk to Plaintiffs and the Classes is significant and ongoing: "the fire involving the large stockpiles of creosote treated railroad ties resulted in hazardous conditions, including but not limited to heavy black smoke and ash containing airborne contaminants, threats to public health and safety, inclusive of evacuation of nearby homes and businesses and the likelihood of significant environmental impacts, as well as disruptions of normal community activities" the resolution states. "The magnitude of this incident required and still requires the coordination and use of local emergency resources and assets, inclusive of state and other external agencies."

178. Early detection and treatment of cancer and many other diseases is associated with more favorable outcomes. Timely-instituted medical monitoring will reduce the risk of illness and

of more severe illness by using medical tests to detect who has been affected by exposure to PM, PM10, PM2.5, and various chemicals including o-, m-, and p-cresols, nitrogen dioxide, carbon monoxide, VOCs, SVOCs, sulfur dioxide and other toxic substances released by the open-air storage, maintenance, grinding of railroad ties, and/or the Railroad Tie Fire, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and well-being of Plaintiffs and the Classes they seek to represent. Medical monitoring and testing procedures, including clinical examinations, exist that make the early detection of exposure to creosote, PM, o-, m-, and p-cresols, nitrogen dioxide, carbon monoxide, VOCs, SVOCs, sulfur dioxide other toxic substances, toxic fumes, and other carcinogens that were released into the class area as a result of the open-air storage, maintenance, grinding of railroad ties, and/or Railroad Tie Fire, as well as early detection of disease, both feasible and beneficial.

179.    The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and the Class Members resulting from their exposure to creosote and other toxic substances can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendants, that: (a) notifies individuals who have been exposed to creosote and other toxic substances of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of disease and injuries caused by exposure to creosote and other toxic substances; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to creosote and other toxic substances.

180.    Establishment of a Court-supervised medical monitoring program can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or

reimbursement for the above-referenced examination and testing procedures and related activities, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

181.    The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, modeling, and other experts. Class adjudication of the right to this relief is both appropriate and necessary.

182.    The medical monitoring program should (a) be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees; (b) involve the monitoring of all Class Members by designated physicians under a Court-approved medical treatment and research regimen; and (c) involve the collection of medical data utilized for group studies, as well as monitoring and treatment of individuals. During program administration, Defendants should address issues implicated by program administration as they develop.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Negligence

#### (Against all Defendants)

183.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-172, asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief.

184.    The Railroad Tie Fire and release of toxic chemicals was caused by the negligence, carelessness, and/or recklessness of the Defendants.

185.     The open-air storage of creosote-treated railroad ties, and the subsequent release of PM, VOCs, SVOCs, creosols,  and other toxic chemicals was caused by the negligence, carelessness, and/or recklessness of the Defendants.

186.     The open-air storage and release of toxic chemicals, as well as the Railroad Tie Fire were caused by defective, unfit, unsafe, dangerous, practices of the Defendants and/or a lack of equipment/facilities, which were in the care, custody, responsibility, and control of Defendants.

187.     Defendants knew or should have known of the dangerous, unfit, defective, and/or highly flammable condition of the railroad ties.

188.     Defendants knew or should have known that storing and maintaining creosote-treated railroad ties unsecured in open-air near the Rainbow River, where they are exposed to weather conditions and the elements, is extremely dangerous and causes damage to the air, water, and ground.

189.     Despite this knowledge, Defendants failed to take reasonable safety precautions to store, maintain, and/or prevent the creosote-treated railroad ties from releasing toxic chemicals into the air, water, and ground.

190.     Despite this knowledge, Defendants failed to take reasonable safety precautions to prevent the railroad ties from catching fire and releasing toxic chemicals.

191.     Defendants owed Plaintiffs and the Class a duty to use reasonable care in the ownership, storage, maintenance, and control of hazardous materials through Marion County, Florida. Consistent with state, local, and federal regulations and industry standards, practices, and procedures, these duties include, but are not limited to, the duty to:

     i.     Properly inspect the railroad ties on the Property;

     ii.    Maintain and store the railroad ties in an enclosed and secure facility;

iii.    Obtain land-use permits from Marion County prior to maintaining, storing, and grinding the railroad ties on the Property;

iv.    Maintain the railroad ties on the Property without the presence of dangerous conditions;

v.    Maintain the railroad ties on the Property in a reasonably safe condition;

vi.    Maintain the railroad ties on the Property in accordance with industry standards;

vii.    Maintain the railroad ties on the Property in accordance with generally accepted practice;

viii.    Not maintain railroad ties on the Property in an unsafe manner;

ix.    Not maintain railroad ties on the Property without the required storage facilities;

x.    Not bring hazardous railroad ties to Marion County, Florida, when Defendants could not maintain the railroad ties in a safe condition;

xi.    Not accept, store, and maintain hazardous railroad ties when Defendants could not prevent the railroad ties from burning;

xii.    Not store hazardous railroad ties when Defendants did not have a reasonably safe location to store the railroad ties;

xiii.    Not store hazardous railroad ties in an area where they could not prevent the railroad ties from burning;

xiv.    Maintain vigilant lookout when storing and maintaining hazardous railroad ties;

xv.    Immediately notify emergency responders when a fire was first observed in

one of the railroad ties;

xvi. To properly maintain, store, and keep the railroad ties in a reasonably safe condition;

xvii. To properly develop and implement risk reduction programs;

xviii. To properly develop and implement risk-based hazard management programs;

xix. To properly develop and implement policies, processes, and procedures for fire prevention and control;

xx. To properly develop and implement policies, processes, and procedures for fire risk management;

xxi. To properly develop and implement policies, processes, and procedures for safe storage and maintenance of the railroad ties;

xxii. To properly develop and implement safety performance evaluation processes;

xxiii. Utilize and implement technology, equipment, alarms, and detectors that timely alert to potential problems and fires;

xxiv. Prevent over-loading the railway with too many railroad ties or other hazardous materials;

xxv. Operate, maintain, inspect and/or repair the railway to ensure that the railroad ties do not catch fire;

xxvi. Adequately staff positions that plan, prepare, coordinate, and oversee the maintenance, storage, and/or control of hazardous materials, including the railroad ties;

xxvii. Train their agents, servants, and employees concerning the maintenance, storage, and/or control of hazardous materials, including the railroad ties

involved in the Railroad Tie Fire;

xxviii.    Properly instruct and adequately train their agents, servants, and employees concerning safety and emergency procedures in the event of a fire;

xxix.    Adequately warn those in danger of imminent exposure to hazardous chemicals;

xxx.    Implement and maintain proper procedures and training for response to a railroad tie fire;

xxxi.    Implement and maintain proper procedures to avoid exposing hazardous materials to the environment;

xxxii.    Implement and maintain proper enclosed storage and treatment facilities to avoid exposing hazardous materials to the environment;

xxxiii.    Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of the Railroad Tie Fire;

xxxiv.    Timely implement such an emergency response plan;

xxxv.    Store and maintain hazardous materials in a manner which would not cause Plaintiffs and Class Members harm, as Plaintiffs and Class Members were foreseeable victims located within the scope of the risk created by Defendants' conduct;

xxxvi.    Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

xxxvii.    Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including o-, m-, and p-cresols, nitrogen

dioxide, carbon monoxide, VOCs, SVOCs, sulfur dioxide, and other toxic chemicals, to persons at risk of exposure, including those outside the evacuation zone;

xxxviii. Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

xxxix. Contain the spread of creosote and hazardous byproducts into the surrounding air, water, soil, real property, and persons.

192. However, inconsistent with state, local, and federal regulations/laws and industry standards, practices, and procedures, Defendants negligently, carelessly, and/or recklessly breached their duties to Plaintiffs and the Class by, among other things:

i. Negligently failing to obtain the proper permits and approvals for the activities they respectively conducted on the Property;

ii. Negligently failing to properly inspect their railroad ties;

iii. Negligently failing to maintain the railroad ties on the Property in a reasonably safe condition;

iv. Negligently failing to store and maintain the railroad ties on the Property in accordance with industry standards;

v. Negligently failing to store and maintain the railroad ties on the Property in accordance with generally accepted practice;

vi. Negligently maintaining and/or storing the railroad ties on the Property when it was unsafe to do so;

vii. Negligently maintaining and/or storing the railroad ties on the Property in an unsafe manner where they are exposed to the environment;

viii.  Negligently maintaining and/or storing the railroad ties in unsecured open air where they are exposed to the environment;

ix.  Negligently maintaining and/or storing the railroad ties on the Property without obtaining the necessary state and local approval;

x.  Negligently maintaining and/or storing the railroad ties on the Property in violation of State and Local law;

xi.  Negligently maintaining and/or storing the railroad ties on the Property after receiving notices of violation from the City of Dunnellon and Marion County;

xii.  Negligently maintaining and/or storing the railroad ties on the Property after receiving repeated requests to remove the railroad ties involved in the Railroad Tie Fire;

xiii.  Negligently maintaining and/or storing the railroad ties on the Property despite actual knowledge of the fire hazard posed by the railroad ties;

xiv.  Negligently accepting hazardous railroad ties when Defendants could not maintain the railroad ties in a safe condition;

xv.  Negligently accepting hazardous railroad ties when Defendants could not prevent the railroad ties from catching fire;

xvi.  Negligently storing hazardous railroad ties when Defendants did not have a reasonably safe location to store the railroad ties;

xvii.  Negligently storing hazardous railroad ties in an area where they could not contain the Railroad Tie Fire and/or limit the spread of hazardous substances;

xviii.  Negligently storing railroad ties in unsecured open air where they were exposed to the environment;

xix.  Negligently failing to maintain vigilant lookout when storing hazardous railroad ties;

xx.  Negligently failing to immediately notify emergency responders when a fire was first observed in one of the railroad ties;

xxi.  Negligently failing to properly maintain, store, and keep the railroad ties in a reasonably safe condition;

xxii.  Negligently failing to properly develop and implement risk reduction programs;

xxiii.  Negligently failing to properly develop and implement risk-based hazard management programs;

xxiv.  Negligently failing to properly develop and implement policies, processes, and procedures for fire prevention and control;

xxv.  Negligently failing to properly develop and implement policies, processes, and procedures for fire risk management;

xxvi.  Negligently failing to properly develop and implement safety performance evaluation processes;

xxvii.  Negligently failing to utilize and implement technology, equipment, alarms, and detectors that timely alert to potential problems and fires;

xxviii.  Negligently over-loading the Property with too many railroad ties or other hazardous materials;

xxix.  Negligently failing to operate, maintain, inspect and/or repair the Property to ensure that the railroad ties do not catch fire;

xxx.  Negligently failing to reasonably staff positions that plan, prepare, coordinate,

and oversee the maintenance, storage, and/or control of hazardous materials, including the railroad ties;

xxxi.   Negligently failing to train their agents, servants, and employees concerning the maintenance, storage, and/or control of hazardous materials, including the railroad ties and issues that arose during the Railroad Tie Fire;

xxxii.   Negligently failing to properly instruct and reasonably train their agents, servants, and employees concerning safety and emergency procedures in the event of a fire at the Property;

xxxiii.   Negligently failing to reasonably warn those in danger of imminent exposure to hazardous chemicals;

xxxiv.   Negligently failing to implement and maintain proper procedures and training for response to the Railroad Tie Fire;

xxxv.   Negligently ignoring Fire Chief Banta's December 4, 2025, warning regarding continued storage of the creosote-treated railroad ties;

xxxvi.   Negligently ignoring FDEP's January 7th Compliance Assistance Officer or remediating any of the violations associated with Defendant Track Line's stormwater permit;

xxxvii.   Negligently failing to comply with FDEP's January 7th Compliance Assistance Officer;

xxxviii.   Negligently allowing unconfined PM to leave the Property and enter soil and water in low-lying areas;

xxxix.   Negligently ignoring Marion County and the City of Dunnellon's notices of violation, stop work orders, and cease and desist orders;

xl. Negligently failing to implement and maintain proper procedures to avoid exposing hazardous materials to the environment;

xli. Negligently failing to implement an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of the Railroad Tie Fire;

xlii. Negligently failing to timely implement such an emergency response plan;

xliii. Negligently failing to store and maintain hazardous materials in a manner which would not cause Plaintiffs and Class Members harm, as Plaintiffs and Class Members were foreseeable victims located within the zone of the risk created by Defendants' conduct;

xliv. Negligently failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

xlv. Negligently failing to accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, such as creosote and other toxic contaminants and byproducts, to persons at risk of exposure;

xlvi. Negligently failing to accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

xlvii. Negligently failing to accurately make known the risk of fire or contamination of the surrounding air, water, land, real property, and persons when the railroad ties were stored and maintained in open air, unsecured, and exposed to the environment;

xlviii. Negligently failing to contain the spread of creosote and hazardous byproducts into the surrounding air, water, land, real property, and persons; and

xlix.     Other acts or omissions which breach the standard of care.

193.    As a direct and proximate result of Defendants' negligent use, discharge, storage, maintenance, disposal, distribution, release, and/or burning of hazardous materials throughout a 30-mile radius surrounding the Railroad Tie Fire, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and/or loss of use and enjoyment.

194.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their air, water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops. Air must be periodically tested to ensure that it is safe for people, livestock, and pets to breathe.

195.    Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to creosote, other contaminants, and byproducts they experienced as a result of Defendants' activities alleged herein.

**[SPACE LEFT INTENTIONALLY BLANK]**

## SECOND CLAIM FOR RELIEF

### Strict Liability

### (Against all Defendants)

196.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-172 asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief.

197.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of Florida Statute §376.313(3).

198.    The storage of the hazardous and flammable substance creosote within the jurisdiction of the State of Florida is a hazardous undertaking under the definition set forth in Florida Statute §376.30(2)(a).

199.    Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by storing and maintaining toxic substances unsecured and in open-air, including but not limited to creosote, through a residential community, making them strictly liable for any resulting damages.

200.    Defendants also engaged in an abnormally dangerous and/or ultrahazardous activity when the creosote-treated railroad ties they were storing ignited into flames in a residential community, making them strictly liable for any resulting damages.

201.    As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs and Class Members presently suffer, and will continue to suffer, real property damage, out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and/or loss of use and enjoyment.

202.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, air, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops. Air must be periodically tested to ensure that it is safe for people, livestock, and pets to breathe.

203.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to creosote, other contaminants and byproducts they experienced as a result of Defendants' activities alleged herein.

204.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class Members, which were a direct and proximate result of the Railroad Tie Fire and release of hazardous substances which harmed Plaintiffs and the Class as described above.

### THIRD CLAIM FOR RELIEF
### Private Nuisance

### (Against All Defendants)

205.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-172 asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief.

206.    At all times relevant hereto, Defendants knew or should have known that creosote was hazardous and harmful to real property and human beings, and it was substantially certain that

improper storage, transportation, handling, burning, and/or disposal of these materials would cause injury to Plaintiffs and the Class Members and their property.

207. At all times relevant hereto, Defendants had a duty to use reasonable care while storing, handling, maintaining, and/or disposing of creosote-treated railroad ties, so that creosote, PM, carbon monoxide, sulfur dioxide, and other dangerous and hazardous chemicals would not be released into the air, water, ground and thereby causing injury to Plaintiffs and the Class Members and their property.

208. Defendants, through the negligent, reckless, and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the Railroad Tie Fire site.

209. Defendants, through the negligent, reckless, and/or intentional acts and omissions alleged herein, have stored, ground, burned and released creosote, other toxic contaminants and byproducts, onto Plaintiffs' and the Class Members' land and have contaminated Plaintiffs' and the Class Members' real property, water, air, and ground.

210. The Defendants' contamination of Plaintiffs' and the Class Members' property with toxic substances, creosote, other contaminants and byproducts, has unreasonably interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or provide water to pets and livestock. This has, in turn, caused significant loss of income, out-of-pocket expenses, loss of use and enjoyment and inconvenience.

211. Defendants' conduct has also substantially interfered with Plaintiffs' and the Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

212. Defendants' negligent, reckless, and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs and the Class Members.

213. Plaintiffs and the Class Members, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious, illegal, and wrongful conduct, including the pollution of their land and water.

214. Defendants' improper storage, transportation, handling, burning, and/or disposal of toxic substances, such as creosote, and the contamination of Plaintiffs' and the Class Members' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs and the Class Members to presently suffer, and continue suffering in the future, real property damage, out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and/or loss of use and enjoyment.

215. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, air, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops. Air must be periodically tested to ensure that it is safe for people, livestock, and pets to breathe.

216.	Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to creosote and other toxic contaminants and byproducts they experienced as a result of Defendants' activities alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Public Nuisance**

**(Against All Defendants)**

217.	Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-172 asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief.

218.	At all times relevant hereto, Defendants knew or should have known that creosote was hazardous and harmful to real property and human beings, and it was substantially certain that improper storage, transportation, handling, burning, and/or disposal of these materials would cause injury to Plaintiffs and the Class Members and their property.

219.	At all times relevant hereto, Defendants had a duty to use reasonable care while storing, handling, maintaining, and/or disposing of creosote-treated railroad ties, so that creosote, PM, carbon monoxide, sulfur dioxide, and other dangerous and hazardous chemicals would not be released into the air, water, ground and thereby causing injury to Plaintiffs and the Class Members and their property.

220.	Plaintiffs and the Class Members have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running and groundwater without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

221. Defendants' improper storage, transportation, handling, burning, and/or disposal of toxic substances, such as creosote, substantially and unreasonably infringed upon and transgressed these public rights.

222. As a proximate result of Defendants' improper storage, transportation, handling, burning, and/or disposal of toxic substances, such as creosote, Plaintiffs,' the Class Members,' and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

223. As a proximate result of Defendants' improper storage, transportation, handling, burning, and/or disposal of toxic substances, such as creosote, Defendants invaded and contaminated the areas surrounding Plaintiffs' and Class Members' residences, thereby exposing them to toxic chemicals and carcinogens.

224. Each of the Plaintiffs and Class Members suffered injuries that are distinct from the public at large because their individual real and personal property rights have been unreasonably interfered with.

225. As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff and Class Members presently suffer, and will continue to suffer, real property damage, out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and/or loss of use and enjoyment.

226. Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, air, and crops to ensure they are safe. Water must

be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops. Air must be periodically tested to ensure that it is safe for people, livestock, and pets to breathe.

227.　Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to creosote and other toxic contaminants and byproducts they experienced as a result of Defendants' activities alleged herein.

## FIFTH CLAIM FOR RELIEF
### Trespass

### (Against All Defendants)

228.　Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-172 asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief..

229.　At all times relevant hereto, Defendants knew or should have known that the creosote-treated railroad ties were hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their emission, discharge, disposal, storage, distribution, burning, spreading and/or release of these hazardous materials would cause injury to Plaintiffs and Class Members and their property.

230.　Defendants, through their activities alleged herein, caused hazardous materials to enter and contaminate Plaintiffs' and the Class Members' property. They intentionally, knowingly, and/or negligently used, discharged, spread, stored, deposited, burned, and/or released these

hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs and the Class Members.

231.    Defendants, through their activities alleged herein, authorized, requested, or caused others to improperly store, dispose of, or burn waste in a manner which they knew was substantially likely to cause hazardous materials, including creosote and/or other combustible liquids to enter and contaminate Plaintiffs' and the Class Members' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and/or negligently caused hazardous materials to enter Plaintiffs' and the Class Members' land, soil, air, and water.

232.    At all relevant times Defendants were aware that their conduct in storing, maintaining, burning, disposing, and/or releasing creosote and other hazardous chemicals was contrary to Plaintiffs' and the Class Members' rights in their property.

233.    At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' and the Class Members' rights to their property.

234.    Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful, reasonable person or business.

235.    The Defendants' intentional, knowing, and/or negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' real and personal property with hazardous materials has interfered with the rights of Plaintiffs and the Class Members to use and enjoy their property and constitutes trespass and continuing trespass.

236.    Defendants' trespass has substantially impaired Plaintiffs' and the Class Members' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

237.    Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members real property damage, out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and/or loss of use and enjoyment.

238.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, air, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops. Air must be periodically tested to ensure that it is safe for people, livestock, and pets to breathe.

239.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to creosote and other hazardous combustibles they experienced as a result of Defendants' activities alleged herein.

## SIXTH CLAIM FOR RELIEF
### Trespass to Chattels

### (Against All Defendants)

240.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-172 asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief.

241. At all relevant times, Plaintiffs and the Class Members had a possessory interest in all their personal property, including but not limited to personal vehicles, commercial vehicles, household goods, food, professional equipment, recreational equipment, livestock, and pets.

242. Defendants, through their activities alleged herein, caused the impairment of Plaintiffs' and the Class Members' property as to its condition, quality, or value and harmed Plaintiffs' materially valuable interest in the same.

243. Defendants, through their activities alleged herein, deprived Plaintiffs and the Class Members of the possession or use of their chattel for a substantial time.

244. Defendants, through their activities alleged herein, caused harm to property in which Plaintiffs and the Class Members had or have a legally protected interest.

245. At all relevant times Defendants were aware that their conduct in storing, handling, releasing, disposing and/or burning of creosote-treated railroad ties on the Property was contrary to Plaintiffs' and the Class Members' legally protected interest in their personal property.

246. The Defendants' intentional, knowing, and/or negligent contamination, and continuing contamination, of Plaintiffs' and the Class Members' personal property substantially impaired Plaintiffs' and the Class Members' legally protected interest in their property as well as economic and property damages as alleged herein.

247. Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' and the Class Members' ability to enjoy their personal property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs and the Class Members so choose.

248. Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs and the Class Members real property damage, out-of-pocket expense, personal property damage,

loss of use and enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and/or loss of use and enjoyment. These damages include, but are not limited to, the contamination and/or death of livestock and pets, and the contamination of personal vehicles, commercial vehicles, household goods, food, professional equipment, and recreational equipment.

249.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, air, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops. Air must be periodically tested to ensure that it is safe for people, livestock, and pets to breathe.

250.    Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to creosote and other hazardous combustibles they experienced as a result of Defendants' activities alleged herein.

## SEVENTH CLAIM FOR RELIEF
### Medical Monitoring

### (Against All Defendants)

251.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-182 asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief.

252. Plaintiffs bring this Seventh Claim for Relief strictly in equity, invoking this Court's inherent equitable jurisdiction to establish a court-supervised medical monitoring program funded by Defendants.

253. Plaintiffs and the Class Members have been exposed to significant amounts of creosote, other contaminants and byproducts, at levels that are far higher than normal background levels. These toxic substances have been proven to cause cancer, liver damage, neurological damage, and other diseases in humans.

254. The hazardous materials stored, burned, disposed of, and released into the air, land, and water by Defendants are highly toxic substances.

255. Plaintiffs and the Classes were exposed to these toxic substances, including creosote, other contaminants and byproducts, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and/or willful and wanton conduct as alleged herein.

256. As a proximate result of their exposure to these toxic substances, creosote, other contaminants and byproducts, Plaintiffs and the Classes have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, lung cancer, skin cancer, bladder cancer, pancreatic cancer, and neurological damage. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

257. This significantly increased risk would warrant a reasonable physician to order medical monitoring.

258. Early diagnosis of these diseases and cancers has significant value for Plaintiffs and the Class Members because such diagnoses will help them monitor and minimize the harm therefrom.

259. Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' and the Class Members' exposures to the toxic substances, creosote, other contaminants and byproducts, as a result of Defendants' actions as alleged herein.

260. As a direct and proximate result of Plaintiffs' and the Class Members' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, PM, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

261. Plaintiffs and the Classes request that this Court exercise its ongoing equitable authority to:

(a) Establish an equitable trust fund completely financed by Defendants;

(b) Appoint an independent fund administrator to manage the fund's operations;

(c) Approve a specialized medical advisory panel to define, implement, and update diagnostic testing protocols;

(d) Establish a secure diagnostic data collection and tracking system that preserves Class members privacy; and

(e) Supervise a court-approved notice program to inform Class members of their eligibility, with the explicit proviso that any non-exhausted residual funds shall revert to Defendants upon the legal termination of the program.

## EIGHTH CLAIM FOR RELIEF
### Intentional Misconduct and/or Gross Negligence

### (Against All Defendants)

262.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in paragraphs 1-172 asserted above as if fully set forth herein, and do not incorporate the allegations, liability elements or legal conclusions of any other count or claim for relief..

263.    At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, intentional, wanton, reckless, and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members.

264.    Defendants were, at all times relevant, aware that creosote is highly carcinogenic, mutagenic and/or otherwise harmful to humans.

265.    Defendants were, at all times relevant, aware of the considerable environmental and health risks associated with open-air storage, burning, disposal, and release of creosote into the air, water, and land, including the risk of polluting impaired waterways and causing various diseases and cancers in the surrounding population.

266.    Defendants were, at all times relevant, aware that storing the railroad ties in an unsecured manner, in open air, during a statewide drought and at the Property was likely to lead to them catching fire and burning in an uncontrollable manner in an area where fire suppression is limited and would cause further environmental damage.

267.    Defendants were, at all times relevant, aware that storing and maintaining  the railroad ties on the Property created an unnecessary risk to life, property, and the environment.

268. Defendants were, at all times relevant, aware that storing the railroad ties on the Property in the manner in which they were stored was a violation of State and Local laws.

269. Notwithstanding this actual knowledge, and inconsistent with Federal, State, and local, laws/regulations and industry standards, practices, and procedures, Defendants breached their duties by, among other things:

    i. Failing to properly inspect their railroad ties;

    ii. Failing to maintain the railroad ties on the Property in a reasonably safe condition;

    iii. Failing to store and maintain the railroad ties on the Property in accordance with industry standards;

    iv. Failing to store and maintain the railroad ties on the Property in accordance with generally accepted practice;

    v. Willfully or with reckless/wanton disregard maintaining and/or storing the railroad ties in unsecured open air where they are exposed to the environment;

    vi. Willfully or with reckless/wanton disregard maintaining and/or storing the railroad ties on the Property without obtaining the necessary state and local approval;

    vii. Willfully or with reckless/wanton disregard maintaining, and/or storing the railroad ties on the Property in violation of State and Local law;

    viii. Willfully or with reckless/wanton disregard maintaining and/or storing the railroad ties on the Property after receiving notices of violation from the City of Dunnellon and Marion County;

    ix. Willfully or with reckless/wanton disregard maintaining and/or storing the

railroad ties on the Property after receiving repeated requests to remove the railroad ties involved in the Railroad Tie Fire;

x.    Willfully or with reckless/wanton disregard maintaining and/or storing the railroad ties on the Property despite actual knowledge of the fire hazard posed by the railroad ties;

xi.    Willfully or with reckless/wanton disregard storing hazardous railroad ties when Defendants did not have a reasonably safe location and/or did not implement appropriate policies, procedures, and operations to store the railroad ties;

xii.    Willfully or with reckless/wanton disregard storing hazardous railroad ties in an area where they could not contain the Railroad Tie Fire and limit the spread of hazardous substances;

xiii.    Willfully or with reckless/wanton disregard maintaining and storing the railroad ties in open air and exposed to the environment;

xiv.    Willfully or with reckless/wanton disregard ignoring risk-based hazard management programs;

xv.    Failing to properly develop and implement safety performance evaluation processes;

xvi.    Failing to utilize and implement technology, equipment, alarms, and detectors that timely alert to potential problems and fires;

xvii.    Failing to operate, maintain, inspect and/or repair the railway to ensure that the railroad ties do not catch fire;

xviii.    Failing to reasonably staff positions that plan, prepare, coordinate, and oversee

the maintenance, storage, and/or control of hazardous materials, including the railroad ties;

xix. Failing to train their agents, servants, and employees concerning the maintenance, storage, and/or control of hazardous materials, including the railroad ties and issues that arose during the Railroad Tie Fire;

xx. Failing to properly instruct and reasonably train their agents, servants, and employees concerning safety and emergency procedures in the event of a fire at the Property;

xxi. Failing to reasonably warn those in danger of imminent exposure to hazardous chemicals;

xxii. Failing to implement and maintain proper procedures and training for response to the Railroad Tie Fire;

xxiii. Willfully or with reckless/wanton disregard ignoring Fire Chief Banta's December 4, 2025, warning regarding continued storage of the creosote-treated railroad ties;

xxiv. Willfully or with reckless/wanton disregard ignoring FDEP's January 7th Compliance Assistance Officer or remediating any of the violations associated with Defendant Track Line's stormwater permit;

xxv. Willfully or with reckless/wanton disregard failing to comply with FDEP's January 7th Compliance Assistance Officer;

xxvi. Willfully or with reckless/wanton disregard allowing unconfined PM to leave the Property and enter soil and water in low-lying areas;

xxvii. Failing to implement and maintain proper procedures to avoid exposing

65 of 70

hazardous materials to the environment;

xxviii.    Failing to implement an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of the Railroad Tie Fire;

xxix.    Failing to timely implement an emergency response plan for events such as the Railroad Tie Fire;

xxx.    Willfully or with reckless/wanton disregard storing and maintaining hazardous materials in a manner that would cause Plaintiffs and Class Members harm, as Plaintiffs and Class Members were foreseeable victims located within the zone of the risk created by Defendants' conduct;

xxxi.    Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

xxxii.    Failing to accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, such as creosote and other toxic contaminants and byproducts, to persons at risk of exposure;

xxxiii.    Failing to accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

xxxiv.    Failing to accurately make known the risk of fire or contamination of the surrounding air, water, land, real property, and persons when the railroad ties were stored and maintained in open air, unsecured, and exposed to the environment;

xxxv.    Failing to contain the spread of creosote and hazardous byproducts into the surrounding air, water, real property, and persons;

xxxvi.   Willfully or with reckless/wanton disregard ignoring Marion County and the City of Dunnellon's notices of violation, stop work orders and cease and desist orders;

xxxvii.   Willfully or with reckless/wanton disregard ignoring Fire Chief Banta's warnings in the December 4, 2025, letter;

xxxviii.   Willfully or with reckless/wanton disregard causing the railroad ties to ignite;

xxxix.   Willfully or with reckless/wanton disregard failing to promptly extinguish the Railroad Tie Fire;

xl.   Otherwise recklessly, with wanton disregard, or willfully causing injury to Plaintiffs and Class Members in ways further investigation and discovery will reveal.

270.   As a direct and proximate result of Defendants' intentional or reckless use, discharge, storage, maintenance, disposal, distribution, release, and/or burning of hazardous materials throughout a 30-mile radius surrounding the Railroad Tie Fire, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out-of-pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of income, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and/or loss of use and enjoyment.

271.   Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, air, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock,

and pets to occupy, and safe for grazing livestock and growing crops. Air must be periodically tested to ensure that it is safe for people, livestock, and pets to breathe.

272.    Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to creosote, other contaminants, and byproducts they experienced as a result of Defendants' activities alleged herein.

273.    Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute gross negligence, willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members so as to warrant the imposition of punitive or exemplary damages.

274.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, and/or intentionally disregarded Plaintiffs' and the Class Members' rights so as to warrant the imposition of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Defendants pursuant to each cause of action set forth in this Complaint as follows:

A.    an order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of the Class members as the Court deems appropriate, under Florida Rule of Civil Procedure 1.220;

B.    an order finding in favor of Plaintiffs and the Classes on all counts

asserted herein;

C.    an order of restitution and all other forms of equitable monetary relief;

D.    an award to Plaintiffs and Class Members of compensatory, exemplary, statutory penalties, punitive, damages, including interest, in an amount to be proven at trial;

E.    an award of attorneys' fees and costs;

F.    an award of pre-judgment and post-judgment interest, as provided by law;

G.    leave to amend this Complaint to conform to the evidence produced at trial; and

H.    such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 1.430(b) of the Florida Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury in all counts of this Amended Complaint except for the Seventh Claim for Relief (Medical Monitoring), which sounds strictly in equity and is submitted exclusively to the equitable jurisdiction and determination of the Court.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via process server on all Defendants.

Dated:          May 19, 2026.                    Respectfully submitted,

THE G LAW GROUP, P.A.
*Attorneys for the Plaintiff(s)*
1501 Biscayne Blvd., Suite 501
Miami, FL 33132
Tel: (305) 709-8877
Fax: (786) 460-8333
sgenadiev@theglawgroup.com

By:    */s/ Simeon Genadiev*

**SIMEON GENADIEV, ESQ.**
Florida Bar No.: 100918

# COMPOSITE EXHIBIT "A"



**FLORIDA DEPARTMENT OF**
**Environmental Protection**

Bob Martinez Center
2600 Blair Stone Road
Tallahassee, Florida 32399-2400

**Ron DeSantis**
Governor

**Jay Collins**
Lt. Governor

**Alexis A. Lambert**
Secretary

September 08, 2025

Dave Malay
Track Line Rail, LLC
700 N Carroll Ave Ste 110
Southlake, TX 76092 6459

Subject: Multi-Sector Generic Permit (MSGP) with Analytical Monitoring Acknowledgement
**Facility ID: FLR05J393-001**
Track Line Rail - Marion County
County: Marion

Dear Permittee:

The Florida Department of Environmental Protection has received and processed the *Notice of Intent to Use Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity* , (NOI), (DEP Form 62-621.300(5)(b), F.A.C.) and the accompanying processing fee.

This letter acknowledges that:

- The NOI is complete;
- The processing fee is paid-in-full; and
- The above referenced facility is covered under the Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity (MSGP), (DEP Rule 62-621.300(5)(a), F.A.C.).

The Facility ID number is **FLR05J393-001**. Please include this number on all future correspondence with the Department regarding this permit.

This letter is **not** the permit; however, this letter does serve as **verification of permit coverage**. A copy of the MSGP Language is available online at https://floridadep.gov/water/stormwater/content/multi-sector-generic-permit-msgp#MSGP and will be included as an enclosure with this Acknowledgement Letter. The facility falls under **Sector A** of the MSGP.

MSGP coverage becomes effective **September 11, 2025** and will expire **September 10, 2030**.

The Operator is authorized to discharge stormwater from the facility site referenced in the NOI to surface waters in accordance with the terms and conditions of the MSGP until the MSGP coverage is terminated or revoked.

Some key conditions of the MSGP are:

- Implementation of the Stormwater Pollution Prevention Plan (SWPPP);
- Implementation of appropriate Best Management Practices (BMPs);
- Conducting and documenting routine inspections; and
- Retaining records required by the permit (including the SWPPP) at the facility; and
- Conducting required monitoring.

## Required Monitoring

### *Quarterly Visual Examinations*

All sectors of the MSGP, except Sector S, require "Quarterly Visual Examination" of stormwater discharges. The visual examination is considered a monitoring requirement; however, it does not require the sample to be analyzed by a laboratory and the results are not required to be submitted to the Department. Instead, the results of the Quarterly Visual Examinations are required to be kept by the facility with its SWPPP.

### *Analytical Monitoring*

Analytical samples of your stormwater discharge(s) must be collected and analyzed at least once each calendar quarter after a qualifying rain event during the periods of January through March, April through June, July through September, and October through December during years **two** and **four** of your permit cycle for the parameters specified in your Sector(s): **Sector A.**

Analytical monitoring must be conducted in accordance with the following schedule:

- Year <u>two monitoring period</u> begins January 1, 2026 and ends December 31, 2026
- Year <u>four monitoring period</u> begins January 1, 2028 and ends December 31, 2028

The samples must be analyzed by a laboratory that has been certified by the Department of Health Environmental Laboratory Certification Program (DOH ELCP).
https://qlik.dep.state.fl.us/anon/sense/app/17c7c199-2c02-4f1e-9288-ad20a293694a

### *DMR Submission Requirements*

At the end of the monitoring year, you must average your quarterly Discharge Monitoring Report (DMR) results and record the quarterly average on an annual DMR form. If there is no stormwater discharged from your facility after a qualifying rain event during a calendar quarter, you must still complete and sign a DMR form for that quarter indicating "No Discharge" by checking the box at the top of the form.

The permittee shall electronically submit the completed DMR forms using the Business Portal / EzDMR ( https://prodenv.dep.state.fl.us/DepEzDMR), unless the permittee has a waiver from the Department in accordance with 40 CFR 127.15 ( https://www.ecfr.gov/current/title-40/chapter-I/subchapter-D/part-127/subpart-B/section-127.15). Reports shall be submitted to the Department by March 31st of the year following your monitoring period or year. For example, analytical monitoring results for 2024 would be due no later than March 31, 2025. If you have any questions regarding the EzDMR system, contact EzDMRAdmin@floridadep.gov.

**Facilities/sites that discharge stormwater to a Municipal Separate Storm Sewer System (MS4 https://ca.dep.state.fl.us/mapdirect/?webmap=9b7d4bdb68d84bd0b890e4ab83b29550) shall submit a copy of the NOI and/or Acknowledgement Letter within 7 days of receipt to the operator of the MS4**

(https://floridadep.gov/water/stormwater/content/stormwater-facilities-lists).

To renew MSGP coverage beyond the expiration date, the Operator must submit a new NOI and processing fee to the Department no later than **two** days before coverage expires.

If you have any questions concerning this Acknowledgment Letter, please contact the NPDES Stormwater Notices Center at NPDES-stormwater@FloridaDEP.gov.

Sincerely,

NPDES Stormwater Program
Florida Department of Environmental Protection

## NOTICE OF RIGHTS

This action is final and effective on the date filed with the Clerk of the Department unless a petition for an administrative hearing is timely filed under Sections 120.569 and 120.57, F.S., before the deadline for filing a petition. On the filing of a timely and sufficient petition, this action will not be final and effective until further order of the department. Because the administrative hearing process is designed to formulate final agency action, the hearing process may result in a modification of the agency action or even denial of the application.

Petition for Administrative Hearing
A person whose substantial interests are affected by the department's action may petition for an administrative proceeding (hearing) under Sections 120.569 and 120.57, F.S. Pursuant to Rules 28-106.201 and 28-106.301, F.A.C., a petition for an administrative hearing must contain the following information:
    (a) The name and address of each agency affected and each agency's file or identification number, if known;
    (b) The name, address, and telephone number of the petitioner; the name, address, and telephone number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding; and an explanation of how the petitioner's substantial interests are or will be affected by the agency determination;
    (c) A statement of when and how the petitioner received notice of the agency decision;
    (d) A statement of all disputed issues of material fact. If there are none, the petition must so indicate;
    (e) A concise statement of the ultimate facts alleged, including the specific facts that the petitioner contends warrant reversal or modification of the agency's proposed action;
    (f) A statement of the specific rules or statutes that the petitioner contends require reversal or modification of the agency's proposed action, including an explanation of how the alleged facts relate to the specific rules or statutes; and
    (g) A statement of the relief sought by the petitioner, stating precisely the action that the petitioner wishes the agency to take with respect to the agency's proposed action.
The petition must be filed (received by the Clerk) in the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@FloridaDEP.gov. Also, a copy of the petition shall be mailed to the applicant at the address indicated above at the time of filing.

Time Period for Filing a Petition
In accordance with Rule 62-110.106(3), F.A.C., petitions for an administrative hearing by the applicant and persons entitled to written notice under Section 120.60(3), F.S., must be filed within **14** days of receipt of

this written notice. Petitions filed by any persons other than the applicant, and other than those entitled to written notice under Section 120.60(3), F.S., must be filed within **14** days of publication of the notice or within **14** days of receipt of the written notice, whichever occurs first. The failure to file a petition within the appropriate time period shall constitute a waiver of that person's right to request an administrative determination (hearing) under Sections 120.569 and 120.57, F.S., or to intervene in this proceeding and participate as a party to it. Any subsequent intervention (in a proceeding initiated by another party) will be only at the discretion of the presiding officer upon the filing of a motion in compliance with Rule 28-106.205, F.A.C.

Extension of Time

Under Rule 62-110.106(4), F.A.C., a person whose substantial interests are affected by the department's action may also request an extension of time to file a petition for an administrative hearing. The department may, for good cause shown, grant the request for an extension of time. Requests for extension of time must be filed with the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@FloridaDEP.gov, before the deadline for filing a petition for an administrative hearing. A timely request for extension of time shall toll the running of the time period for filing a petition until the request is acted upon.

Mediation

Mediation is not available in this proceeding.

Judicial Review

Once this decision becomes final, any party to this action has the right to seek judicial review pursuant to Section 120.68, F.S., by filing a Notice of Appeal pursuant to Florida Rules of Appellate Procedure 9.110 and 9.190 with the Clerk of the Department in the Office of General Counsel (Station #35, 3900 Commonwealth Boulevard, Tallahassee, Florida 32399-3000) and by filing a copy of the Notice of Appeal accompanied by the applicable filing fees with the appropriate district court of appeal. The notice must be filed within 30 days from the date this action is filed with the Clerk of the Department.

## FLORIDA DEPARTMENT OF
## Environmental Protection

Bob Martinez Center
2600 Blair Stone Road
Tallahassee, Florida 32399-2400

**Ron DeSantis**
Governor

**Jay Collins**
Lt. Governor

**Alexis A. Lambert**
Secretary

## Receipt for Submission

For:
**Dave Malay**

Facility ID: **FLR05J393**
Facility Address: **(Parcel# 3368-000-03) East off of US Highway 41 in between SW 99th Place and SW 107th Lane Dunnellon, FL 34432**
**- Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity (MSGP)**
COUNTY: **Marion**

The department acknowledges receipt of your Notice of Intent (NOI) to use NPDES Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity (MSGP). The Acknowledgement Letter, a copy of your NOI and the Generic Permit are attached.

Please note that for sites discharging to an MS4, the Operator must send a copy of the NOI or the acknowledgement letter within 7 calendar days of receipt to the operator of the MS4. If applicable, Quarterly and Annual Discharge Monitoring Reports (DMRs) must be submitted using the department's Electronic DMR System (EzDMR).

If you have any questions concerning this e-mail, please contact the NPDES Stormwater Notices Center at (866) 336-6312 or NPDES-stormwater@FloridaDEP.gov.

Attachments: Notice of Intent - MSGP, Acknowledgement Letter, Multisector Generic Permit Rule



# FLORIDA DEPARTMENT OF
# Environmental Protection

Bob Martinez Center
2600 Blair Stone Road
Tallahassee, FL 32399-2400

**Ron DeSantis**
Governor

**Jay Collins**
Lt. Governor

**Alexis A. Lambert**
Secretary

*Electronically Sent - Received Receipt Requested*

Mr. Dave Malay
Chief Executive Office (CEO)
Track Line, LLC
700 N. Carroll Ave., Suite 110
Southlake, TX 76092

Re:     Project No. 0830196-001-AC
        Track Line, LLC, Dunnellon Facility
        New Shredding and Grinding of Wooden Railroad Ties Operation

Dear Mr. Malay:

On August 29, 2025, you submitted an application requesting authorization to install a facility to shred and grind creosote-treated railroad ties (CTRT) into a 1-inch minus product for shipment to cement kilns permitted to use the material as a fuel. The new facility will be in Marion County at 20365 E. McKinney Avenue in Dunnellon, Florida. Enclosed are the following documents: the Written Notice of Intent to Issue Air Permit; the Public Notice of Intent to Issue Air Permit; the Technical Evaluation and Preliminary Determination; and the draft permit with Appendices. The Public Notice of Intent to Issue Air Permit is the actual notice that you must have published in the legal advertisement section of a newspaper of general circulation in the area affected by this project. If you have any questions, please contact the Project Engineer, Mr. Scott M. Sheplak, MPA, P.E., by telephone at 850/717-9074 or by email at scott.sheplak@FloridaDEP.gov.

Sincerely,

David Lyle Read, P.E., Environmental Administrator SES
Permit Review Section
Division of Air Resource Management

Enclosures

DLR/sms

## WRITTEN NOTICE OF INTENT TO ISSUE AIR PERMIT

*In the Matter of an*
*Application for Air Permit by:*

Track Line, LLC
20365 E. McKinney Avenue
Dunnellon, Florida  34432

Project No. 0830196-001-AC
Minor Air Construction Permit
Dunnellon Facility
New Shredding and Grinding of
Wooden Railroad Ties Operation
Marion County, Florida

*Authorized Representative:*
   Mr. Dave Malay, Chief Executive Office (CEO)

**Facility Location**:  On August 29, 2025, Track Line, LLC submitted to the Department an application to construct a new facility in Marion County at 20365 E. McKinney Avenue in Dunnellon, Florida that will shred and grind wooden railroad ties.

**Project**:  The purpose of this project is to install a facility to shred and grind creosote-treated railroad ties (CTRT) into a 1-inch minus product for shipment to cement kilns permitted to use the material as a fuel.

In addition to the material handling, operations will employ three mobile, track-mounted Tier 4 diesel-powered engines - a shredder and two grinders.  All processed material will be loaded directly into live bed trailers (trucks) beneath a mobile dome canopy.  There will be no outdoor storage of shredded CTRT and the  shredded CTRT will be shipped off-site immediately upon completion of processing or once shipment trailers are fully loaded. The applicant has proposed taking reasonable precautions to prevent unconfined emissions of particulate matter (PM) at the facility.

**Permitting Authority**:  Applications for air construction permits are subject to review in accordance with the provisions of Chapter 403, Florida Statutes (F.S.) and Chapters 62-4, 62-210 and 62-212 of the Florida Administrative Code (F.A.C.).  The proposed project is not exempt from air permitting requirements and an air permit is required to perform the proposed work.  The Division of Air Resource Management's (DARM) Permit Review Section is the Permitting Authority responsible for making a permit determination for this project.  The Permitting Authority's physical address is:  2600 Blair Stone Road. Tallahassee, Florida.  The Permitting Authority's mailing address is:  2600 Blair Stone Road, MS #5505, Tallahassee, Florida 32399-2400.  The Permitting Authority's telephone number is 850/717-9000.

**Project File**:  A complete project file is available for public inspection during the normal business hours of 8:00 a.m. to 5:00 p.m., Monday through Friday (except legal holidays), at address indicated above for the Permitting Authority.  The complete project file includes the draft permit, the Technical Evaluation and Preliminary Determination, the application, and the information submitted by the applicant, exclusive of confidential records under Section 403.111, F.S.  Interested persons may contact the Permitting Authority's project review engineer for additional information at the address or phone number listed above.

**Notice of Intent to Issue Permit**:  The Permitting Authority gives notice of its intent to issue an air permit to the applicant for the project described above.  The applicant has provided reasonable assurance that operation of the proposed equipment will not adversely impact air quality and that the project will comply with all appropriate provisions of Chapters 62-4, 62-204, 62-210, 62-212, 62-296 and 62-297, F.A.C.  The Permitting Authority will issue a final permit in accordance with the conditions of the draft permit unless a timely petition for an administrative hearing is filed under Sections 120.569 and 120.57, F.S. or unless public comment received in accordance with this notice results in a different decision or a significant change of terms or conditions.

**Public Notice**:  Pursuant to Section 403.815, F.S. and Rules 62-110.106 and 62-210.350, F.A.C., you (the applicant) are required to publish at your own expense the enclosed Public Notice of Intent to Issue Air Permit (Public Notice).  The Public Notice shall be published one time only as soon as possible in the legal advertisement section of a newspaper of general circulation in the area affected by this project.  The newspaper used must meet the requirements of Sections 50.011 and 50.031, F.S. in the county where the activity is to take place.  If you are uncertain that a newspaper meets these requirements, please contact the Permitting Authority at above address or phone number.  Pursuant to Rule 62-110.106(5) and (9), F.A.C., the applicant shall provide proof of publication

Track Line, LLC
Dunnellon Facility

Air Permit No. 0830196-001-AC
Shredding and Grinding of Wooden Railroad Ties

**WRITTEN NOTICE OF INTENT TO ISSUE AIR PERMIT**

to the Permitting Authority at the above address within 7 days of publication. Failure to publish the notice and provide proof of publication may result in the denial of the permit pursuant to Rule 62-110.106(11), F.A.C.

**Comments**: The Permitting Authority will accept written comments concerning the draft permit for a period of 14 days from the date of publication of the Public Notice. Written comments must be received by the Permitting Authority by close of business (5:00 p.m.) on or before the end of the 14-day period. If written comments received result in a significant change to the draft permit, the Permitting Authority shall revise the draft permit and require, if applicable, another Public Notice. All comments filed will be made available for public inspection.

**Petitions**: A person whose substantial interests are affected by the proposed permitting decision may petition for an administrative hearing in accordance with Sections 120.569 and 120.57, F.S. Petitions filed by the applicant or any of the parties listed below must be filed within 14 days of receipt of this written notice of Intent to Issue Air Permit. Petitions filed by any persons other than those entitled to written notice under Section 120.60(3), F.S., must be filed within 14 days of publication of the attached Public Notice or within 14 days of receipt of this written notice of Intent to Issue Air Permit, whichever occurs first. Under Section 120.60(3), F.S., however, any person who asked the Permitting Authority for notice of agency action may file a petition within 14 days of receipt of that notice, regardless of the date of publication. A petitioner shall mail a copy of the petition to the applicant at the address indicated above, at the time of filing. A petition for administrative hearing must contain the information set forth below and must be filed (received) with the Agency Clerk in the Office of General Counsel, 3900 Commonwealth Boulevard, MS 35, Tallahassee, Florida 32399-3000, Agency_Clerk@dep.state.fl.us, before the deadline. The failure of any person to file a petition within the appropriate time period shall constitute a waiver of that person's right to request an administrative determination (hearing) under Sections 120.569 and 120.57, F.S., or to intervene in this proceeding and participate as a party to it. Any subsequent intervention (in a proceeding initiated by another party) will be only at the approval of the presiding officer upon the filing of a motion in compliance with Rule 28-106.205, F.A.C.

A petition that disputes the material facts on which the Permitting Authority's action is based must contain the following information: (a) The name and address of each agency affected and each agency's file or identification number, if known; (b) The name, address, any email address, telephone number and any facsimile number of the petitioner; the name, address any email address, telephone number, and any facsimile number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding; and an explanation of how the petitioner's substantial interests will be affected by the agency determination; (c) A statement of when and how each petitioner received notice of the agency action or proposed decision; (d) A statement of all disputed issues of material fact. If there are none, the petition must so indicate; (e) A concise statement of the ultimate facts alleged, including the specific facts the petitioner contends warrant reversal or modification of the agency's proposed action; (f) A statement of the specific rules or statutes the petitioner contends require reversal or modification of the agency's proposed action including an explanation of how the alleged facts relate to the specific rules or statutes; and, (g) A statement of the relief sought by the petitioner, stating precisely the action the petitioner wishes the agency to take with respect to the agency's proposed action. A petition that does not dispute the material facts upon which the Permitting Authority's action is based shall state that no such facts are in dispute and otherwise shall contain the same information as set forth above, as required by Rule 28-106.301, F.A.C.

Because the administrative hearing process is designed to formulate final agency action, the filing of a petition means that the Permitting Authority's final action may be different from the position taken by it in this written notice of Intent to Issue Air Permit. Persons whose substantial interests will be affected by any such final decision of the Permitting Authority on the application have the right to petition to become a party to the proceeding, in accordance with the requirements set forth above.

**Extension of Time**: Under Rule 62-110.106(4), F.A.C., a person whose substantial interests are affected by the Department's action may also request an extension of time to file a petition for an administrative hearing. The Department may, for good cause shown, grant the request for an extension of time. Requests for extension of time must be filed with the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@dep.state.fl.us,

---

| | |
|---|---|
| Track Line, LLC | Air Permit No. 0830196-001-AC |
| Dunnellon Facility | Shredding and Grinding of Wooden Railroad Ties |

## WRITTEN NOTICE OF INTENT TO ISSUE AIR PERMIT

before the deadline for filing a petition for an administrative hearing. A timely request for extension of time shall toll the running of the time period for filing a petition until the request is acted upon.

**Mediation:** Mediation is not available in this proceeding.

Executed in Tallahassee, Florida.

David Lyle Read, P.E., Environmental Administrator SES
Permit Review Section
Division of Air Resource Management

### CERTIFICATE OF SERVICE

The undersigned duly designated deputy agency clerk hereby certifies that this written notice of Intent to Issue Air Permit package (including the Public Notice of Intent to Issue Air Permit, the Technical Evaluation and Preliminary Determination and the draft permit with Appendices) was sent by electronic mail, or a link to these documents made available electronically on a publicly accessible server, with received receipt requested before the close of business on the date indicated below to the following persons.

Mr. Dave Malay, Chief Executive Office (CEO), Track Line, LLC: dmalay@tracklinerail.com
Mr. Kenneth Layton, P.E., Layton Environmental Engineering: ken@laytonee.com
Mr. Roger Smith, Layton Environmental Engineering: rogersmith@laytonee.com
DEP's Central District (CD) Office: DEP_CD@dep.state.fl.us
Mr. Reggie Phillips, DEP CD Office: Reggie.Phillips@FloridaDEP.gov
Mr. Colin Campbell, DEP CD: Colin.Campbell@FloridaDEP.gov
Ms. Amy Hilliard, DEP: Amy.Hilliard@FloridaDEP.gov

Clerk Stamp

**FILING AND ACKNOWLEDGMENT FILED,** on
this date, pursuant to Section 120.52(7), Florida Statutes,
with the designated agency clerk, receipt of which is
hereby acknowledged.

# COMPOSITE EXHIBIT "B"

| From: | Dover, Patrick |
|---|---|
| To: | Blackburn, Linda |
| Cc: | Varadin, Chuck; Brazell, Walker; Bryant, Kathy; Minter, Matthew |
| Subject: | RE: [E] Track Line Rail, LLC |
| Date: | Wednesday, December 10, 2025 11:28:09 AM |
| Attachments: | image001.png |
| | image002.png |

**CAUTION: THIS MESSAGE IS FROM AN EXTERNAL SENDER**
This email originated from outside the organization. Do not click links, open attachments, or share any information unless you recognize the sender and know the content is safe. Report suspicious emails using the "Phish Alert" button in Outlook or contact the Helpdesk.

Ms. Blackburn,

As an update, we have reached an agreement with Track Line for the prompt removal of the ties.

Track Line will load the ties into our rail cars, which will then be shipped out of state. We have mobilized the initial batch of rail cars. They should begin to arrive at the site as early as this week so that the loading process can begin.

Please let me know if you have any questions or would like to discuss.

Best,

**R. Patrick Dover**
**Senior Counsel, Law Department**
**CSX Transportation**
**T. 904.359.3998**
**500 Water Street, J150, Jacksonville, Florida 32202**



**From:** Blackburn, Linda <Linda.Blackburn@marionfl.org>
**Sent:** Thursday, December 4, 2025 5:34 PM
**To:** Dover, Patrick <Patrick_Dover@csx.com>
**Cc:** Varadin, Chuck <Chuck.Varadin@marionfl.org>; Brazell, Walker <Walker_Brazell@csx.com>; Bryant, Kathy <Kathy.Bryant@marionfl.org>; Minter, Matthew <Matthew.Minter@marionfl.org>
**Subject:** RE: [E] Track Line Rail, LLC

**This Message Is From an External Sender**

This message came from outside your organization.

Thank you, Mr. Dover, for your telephone call yesterday. I am hopeful that, as we discussed, Track Line Rail, LLC will be agreeable to CSX' terms for its voluntary removal of the railroad ties from the CSX Property in our County and the City of Dunnellon.

I just want to briefly memorialize our discussion. It is my understanding that CSX, at no time agreed to allow Track Line Rail, LLC the ability to construct a facility for the shredding or grinding of railroad ties on the CSX property as indicated in Track Line Rail, LLC's FDEP Permit Application. Additionally, title and ownership of the railroad ties belongs to Track Line Rail, LLC by virtue of a contract with Track Line Rail, LLC for its removal and disposal of CSX railroad ties, not a contract for Track Line Rail, LLC to redeposit the ties on CSX property, shred and grind the ties on CSX property and then ship the materials elsewhere. I also reiterated to you that no representative from Track Line Rail, LLC has reached out to Marion County to address any of Marion County's Code Enforcement's Notices, let alone to discuss with Marion County how to properly conduct its operations on CSX' property.

I indicated to you that the County was ready to file for an injunction as the "clear by" date of December 3, 2025 had not been met, but we would be able to hold off on filing any court action for at least a week with our mutual understanding that you would make all efforts to come to an agreement with Track Line Rail, LLC for the voluntary removal of the railroad ties and an aggressive timeline for them to do so. You advised me that you would let me know by next week if this was feasible and if not, we could then figure out how the County and CSX should best proceed to have the railroad ties removed.

As an aside, I have attached communication from Marion County's Fire Chief, Chief Banta, directed to the Mayor of the City of Dunnellon for which I thought CSX should be aware. The fire hazard of Track Line Rail, LLC's railroad ties is extremely concerning, and I will leave it to your judgment to share with Track Line Rail, LLC in your communications with them.

I do greatly appreciate your assistance, cooperation, and consideration in this matter. Please feel free to contact me immediately if there is anything in this communication that I am incorrectly memorializing or if you have any additional questions or concerns.

Many thanks,

**Linda Blackburn**
*Assistant County Attorney*



County Attorney

Marion County Board of County Commissioners
601 SE 25th Ave.
Ocala, FL  34471
Main: 352-438-2330

Empowering Marion for Success!

Under Florida law, emails to our organization are public records. If you do not want your email reviewed in response to a public records request, contact this office by phone.

**From:** Dover, Patrick <Patrick_Dover@csx.com>
**Sent:** Wednesday, December 3, 2025 3:55 PM
**To:** Blackburn, Linda <Linda.Blackburn@marionfl.org>
**Cc:** Hough, Robin <Robin.Hough@marionfl.org>; Varadin, Chuck <Chuck.Varadin@marionfl.org>; Brazell, Walker <Walker_Brazell@csx.com>
**Subject:** RE: [E] Track Line Rail, LLC

You don't often get email from patrick_dover@csx.com. Learn why this is important

**CAUTION: THIS MESSAGE IS FROM AN EXTERNAL SENDER**
This email originated from outside the organization. Do not click links, open attachments, or share any information unless you recognize the sender and know the content is safe. Report suspicious emails using the "Phish Alert" button in Outlook or contact the Helpdesk.

Ms. Blackburn,

Thanks for sending this information. As discussed, I spoke with our internal teams today on this matter.  I will try you around 4:45 this afternoon if that works for you.

Best,

**R. Patrick Dover**
**Senior Counsel, Law Department**
**CSX Transportation**
**T. 904.359.3998**
**500 Water Street, J150, Jacksonville, Florida 32202**



**From:** Blackburn, Linda <Linda.Blackburn@marionfl.org>
**Sent:** Tuesday, December 2, 2025 4:34 PM

**To:** Dover, Patrick <Patrick_Dover@csx.com>
**Cc:** Hough, Robin <Robin.Hough@marionfl.org>; Varadin, Chuck <Chuck.Varadin@marionfl.org>;
Brazell, Walker <Walker_Brazell@csx.com>
**Subject:** RE: [E] Track Line Rail, LLC

**This Message Is From an External Sender**

This message came from outside your organization.

Thank you, Mr. Dover, for making yourself available to further discuss this matter and Marion County's concerns. As we discussed, below are some links to prior city council meetings concerning Track Line Rail, LLC's operation. I have also provided a Facebook video provided by a concerned citizen which captures the scope of the matter.
https://www.newberryfl.gov/citycouncil/page/special-commission-meeting-17
https://dunnellon.granicus.com/ViewPublisher.php?view_id=1 (October 27, 2025 - Special City Council Meeting)
https://www.facebook.com/FLYINGHIGHINFLORIDA/videos/-toxic-ties-in-dunnellon-old-railroad-ties-creosote-coated-piled-sky-high-just-a/759455440439955/

Also, and as it pertains to the location of the rail ties, Track Line Rail, LLC advised the FDEP in its permit application that its activities would be relegated to the area depicted in red on the attached Technical Evaluation and Preliminary Determination. This parcel (ID 33638-000-03) is not the only CSX parcel where the rail ties have been deposited, and further, this parcel does not appear to be the Florida Northern operated and managed parcel (See, PID 33638-000-02).

Essentially, Marion County is wanting the immediate removal of the rail ties brought to the site at the behest of Track Line Rail, LLC. Please let me know how I can be of further assistance in swiftly resolving this matter or if I can provide any additional information to you for your and CSX's consideration moving forward. I look forward to speaking with you again tomorrow.

Warm regards,



**Linda Blackburn**
*Assistant County Attorney*
County Attorney

Marion County Board of County Commissioners
601 SE 25th Ave.
Ocala, FL  34471

Main: 352-438-2330

Empowering Marion for Success!

Under Florida law, emails to our organization are public records. If you do not want your email reviewed in response to a public records request, contact this office by phone.

**From:** Dover, Patrick <Patrick_Dover@csx com>
**Sent:** Tuesday, December 2, 2025 1:54 PM
**To:** Blackburn, Linda <Linda.Blackburn@marionfl.org>
**Cc:** Hough, Robin <Robin Hough@marionfl org>; Varadin, Chuck <Chuck.Varadin@marionfl.org>;
Brazell, Walker <Walker_Brazell@csx.com>
**Subject:** RE: [E] Track Line Rail, LLC

You don't often get email from patrick_dover@csx.com. Learn why this is important

**CAUTION: THIS MESSAGE IS FROM AN EXTERNAL SENDER**
This email originated from outside the organization. Do not click links, open attachments, or share any information unless you recognize the sender and know the content is safe. Report suspicious emails using the "Phish Alert" button in Outlook or contact the Helpdesk.

Ms. Blackburn,

I am in-house counsel for CSXT.  Mr. Brazell forwarded the below email to me and referenced the attached notices.

I only received the most recent notice today and am still investigating the factual assertions in the notices.  I should have more information by the end of this week.

That said, I am available to discuss before then if helpful.

Best,

**R. Patrick Dover**
**Senior Counsel, Law Department**
**CSX Transportation**
**T. 904.359.3998**
**500 Water Street, J150, Jacksonville, Florida 32202**



**From:** Blackburn, Linda <Linda.Blackburn@marionfl.org>
**Sent:** Tuesday, December 2, 2025 10:38 AM
**To:** Brazell, Walker <Walker_Brazell@csx.com>
**Cc:** Hough, Robin <Robin.Hough@marionfl.org>; Varadin, Chuck <Chuck.Varadin@marionfl.org>

**Subject:** [E] Track Line Rail, LLC

You don't often get email from linda.blackburn@marionfl.org  Learn why this is important

**This Message Is From an External Sender**

This message came from outside your organization.

Dear Mr. Brazell, you and I spoke before the week before the Thanksgiving holiday where you indicated that you would e-mail to me the name of CSX' legal counsel or a contact to set up a conference with the CSX legal counsel after the holiday.  I left you a message yesterday again requesting this same information.

Would you please be so kind as to provide this information to me so that I can discuss this matter further with CSX and hopefully arrive at a workable solution for all parties involved.

Thank you,



**Linda Blackburn**

*Assistant County Attorney*

County Attorney

Marion County Board of County Commissioners

601 SE 25th Ave.

Ocala, FL  34471

Main: 352-438-2330

Empowering Marion for Success!

Under Florida law, emails to our organization are public records. If you do not want your email reviewed in response to a public records request, contact this office by phone.

This email transmission and any accompanying attachments may contain CSX privileged and confidential or business proprietary information intended only for the use of the intended addressee. Any dissemination, distribution, forwarding, copying, or action taken in reliance on the contents of this email by anyone other than the intended recipient is strictly prohibited. If you have received this email in error please immediately delete it, destroy all copies, and notify the sender at the above CSX email address. This email transmission and any accompanying attachments may contain CSX privileged and confidential or business proprietary information intended only for the use of the intended addressee. Any dissemination, distribution, forwarding, copying, or action

taken in reliance on the contents of this email by anyone other than the intended recipient is strictly prohibited. If you have received this email in error please immediately delete it, destroy all copies, and notify the sender at the above CSX email address.

This email transmission and any accompanying attachments may contain CSX privileged and confidential or business proprietary information intended only for the use of the intended addressee. Any dissemination, distribution, forwarding, copying, or action taken in reliance on the contents of this email by anyone other than the intended recipient is strictly prohibited. If you have received this email in error please immediately delete it, destroy all copies, and notify the sender at the above CSX email address.



**Marion County
Board of County Commissioners**

**Fire Rescue • Headquarters**

2631 SE Third St.
Ocala, FL 34471
Phone: 352-291-8000
Fax: 352-291-8098



December 4, 2025

Walter Green, Mayor
City of Dunnellon
20750 River Drive
Dunnellon, FL 34431

Dear Mayor Green:

Pursuant to our conversation, I am providing an operational overview of the decisions Marion County Fire Rescue (MCFR) would face if a fire were to occur involving the creosote-treated railroad ties currently stored in Dunnellon. My intent is to outline the practical fire service implications and the environmental constraints that would guide our response. Creosote-treated railroad ties create a unique type of incident. A fire involving these materials is not a standard wood fire. Creosote behaves more like a petrochemical, burning extremely hot, producing heavy black smoke, and generating contaminated runoff capable of polluting soil and waterways. If these ties ignited, MCFR would immediately be forced into a series of challenging tactical decisions. One of the most difficult decisions would be determining whether to aggressively extinguish the fire or to allow it to burn under control. Aggressive suppression would require very large volumes of water and foam, producing contaminated runoff that could easily reach stormwater systems, wetlands, and ultimately the Rainbow River watershed. Even with rapid deployment of containment equipment, our ability to manage that runoff would be limited. The alternative of allowing the pile to burn in a controlled manner is sometimes used in industrial fuel fires when suppression would worsen environmental damage. However, this strategy would require isolating the pile, protecting nearby exposures, and accepting prolonged smoke impacts on air quality and public health. Neither option is favorable, and both carry significant environmental and public-safety consequences.

In addition to these suppression concerns, we must factor in the potential need to protect nearby homes, businesses, or wooded areas. If exposures are threatened, resources would be diverted to structural protection, reducing our ability to fully control the tie fire itself. Firefighter health and safety is another critical concern, as burning creosote releases toxic vapors and particulates. Suppression efforts would require extended use of self-contained breathing apparatus (SCBA) and decontamination procedures, while still posing long-term exposure risks to personnel. A fire of this nature would also require immediate multi-agency coordination involving hazmat teams, environmental agencies, law enforcement for road closures and air-quality alerts, and public health officials for potential shelter-in-place or evacuation guidance. This level of coordination places a substantial strain on resources and impacts the broader community.

From strictly a fire-service perspective, the safest and least damaging fire is the one prevented. The railroad ties, as stored now, present an extremely high fire load in a location where access becomes limited once a fire is fully involved. Any suppression effort would create contaminated runoff, while allowing it to burn would expose the community to prolonged toxic smoke. Either choice carries unavoidable environmental and public health impacts. Removing the ties eliminates these difficult decisions entirely and prevents the city from being placed in a situation where every available option is harmful.

I offer this assessment not from a regulatory or political standpoint, but from a fire chief's perspective grounded in operational realities and community safety. My responsibility is to protect life, property, and the environment, and in this case, all three are put at unnecessary risk by the continued storage of creosote-treated ties.

Respectfully,

James Banta
Fire Chief

# EXHIBIT "C"



# FLORIDA DEPARTMENT OF
# Environmental Protection

**Ron DeSantis**
Governor

**Jay Collins**
Lt. Governor

**Alexis A. Lambert**
Secretary

Central District Office
3319 Maguire Blvd. Suite 232
Orlando, FL 32803

January 7, 2026

Dave Malay, Chief Executive Officer
Track Line Rail, LLC
700 N. Carroll Ave., Ste. 110
Southlake, TX 76092
dmalay@tracklinerail.com

Re:     Compliance Assistance Offer
        Track Line Rail – Dunnellon Facility
        NPDES Facility ID FLR05J393
        Marion County

Dear Mr. Malay :

An inspection was conducted at your property on December 15, 2025. During this inspection, potential non-compliance was noted. The purpose of this letter is to offer compliance assistance as a means of resolving these matters.

Specifically, potential non-compliance with the requirements of chapter 403, Florida Statutes, and chapter 62-621, Florida Administrative Code were observed. Please see the attached inspection report for a full account of Department observations and recommendations.

We request you review the items of concern noted and respond in writing within **30 days** of receipt of this Compliance Assistance Offer. Your written response should include one of the following:

1.  Describe what has been done to resolve the non-compliance issue or provide a schedule describing how/when the issue will be addressed,
2.  Provide the requested information, or information that mitigates the concerns or demonstrates them to be invalid, or
3.  Arrange for the case manager to visit your facility to discuss the items of concern.

It is the Department's desire that you are able to adequately address the aforementioned issues so that this matter can be closed. Your failure to respond promptly may result in the initiation of formal enforcement proceedings.

Please address your response and any questions to Kage Horvath of the Central District Office at (407) 897-4334 or via e-mail at Kage.Horvath@FloridaDEP.gov. We look forward to your cooperation with this matter.

*floridadep.gov*

Track Line Rail, LLC – FLR05J393
Compliance Assistance Offer
Page 2 of 2
January 7, 2026


Sincerely,

*Colin Campbell*

Colin Campbell, Environmental Manager
Central District
Florida Department of Environmental Protection


Enclosures:    Inspection Report (with attachments)

cc:    Steve Spear, Site Manager, sspear@tracklinerail.com



# Department of Environmental Protection
# Industrial Stormwater Inspection Report
Form DWRM - WCAP - 20 - 043
*Updated 08.01.22*



## Facility and Inspection Information

| | | | | | | |
|---|---|---|---|---|---|---|
| Physical Location: Track Line Rail - Marion County | | | Permit No.: | FLR05J393 | Inspection Date: | Dec 15, 2025 |
| (Parcel# 3368-000-03) | | | Effective Date: | Sep 11, 2025 | Entry Time: | 10:29am |
| Dunnellon , FL 34432 | | | Expiration Date: | Sep 10, 2030 | Exit Time: | 12:12pm |
| Mailing Address: Track Line Rail, LLC | | | District: | Central | Hydrologic Conditions: | Normal |
| | | | County: | Marion | | |
| 700 N Carroll Ave, Ste 110 | | | Water Mgmt. District: | SWFWMD | Latitude: | 29 ° 4 ' 6.84 " |
| Southlake , TX 76092-6459 | | | | | Longitude: | 82 ° 26 ' 42.53 " |
| Receiving Waters or MS4: Outfall To Rainbow River (Blue Run) | | | No. Employees: | Unknown | Size of Property (acres): | 66 |
| | | | No. Shifts: | Unknown | Years at Location: | < 1 |
| Classification: Class III | Other: 303(d) | | Operating Hrs.: | Unknown | No. of Outfalls: | Unknown |

## Industrial Activity

| SIC Code: | Analytical Reqmnt: | Sector: | Sector Description: |
|---|---|---|---|
| 2499 | Yes | A | Timber Products |
| | | | |
| | | | |
| | | | |

## Company Representatives

| On-Site Representatives | Title | Company/Organization Name | Telephone |
|---|---|---|---|
| Dave Malay | Chief Executive Officer | Track Line Rail, LLC | (312) 848-1812 |
| Steve Spear | Site Manager | Track Line Rail, LLC | (416) 508-1277 |
| | | | |
| | | | |

| Responsible Authority (RA) | Title | Company/Organization Name | Telephone |
|---|---|---|---|
| Dave Malay | Chief Executive Officer | Track Line Rail, LLC | (312) 848-1812 |

RA Email Address: dmalay@tracklinerail.com

## Inspection Comments

Track Line Rail is a treated railroad ties (creosote and otherwise) processing facility located in Dunnellon, FL 34432. On December 15, 2025, the Department conducted a full compliance evaluation inspection on-site and via digital file review. Inspectors confirmed site access via phone call with Dave Malay and Steve Spear. The Stormwater Pollution Prevention Plan (SWPPP) was reviewed digitally off-site. Potential non-compliance with the SWPPP and Best Management Practices (BMPs) were noted. See the inspection report and attached photo log for more details. At this time, the Department will be issuing a written Compliance Assistance Offer (CAO) to address any outstanding items or concerns.

## Weather Conditions

No rain events in the past 24 hours.

## Summary Evaluation

Overall Inspection Rating:    Out of Compliance

Section Ratings:

| | | Ratings Key: | |
|---|---|---|---|
| S | Permit | S = Satisfactory or In Compliance | N/A = Not Applicable |
| M | Condition of Receiving Waters | M = Marginal or Out of Compliance | N/C = Not Covered |
| M | Facility Site Review | U = Unsatisfactory or Significantly Out of Compliance | |
| M | Plans/Monitoring | N = Not Evaluated | |

## Inspector Information

| Inspector Name | Office | Email | Telephone |
|---|---|---|---|
| Kage Horvath | Central District Office | Kage.Horvath@FloridaDEP.gov | (407) 897-4334 |
| Colin Campbell | Central District Office | Colin.Campbell@FloridaDEP.gov | (407) 897-4167 |
| Jordan Evans | Central District Office | Jordan.Evans@FloridaDEP.gov | (407) 897-4119 |
| | | | |

# Department of Environmental Protection
# Industrial Stormwater Inspection Report

Form DWRM - WCAP - 20 - 043

*Updated 08.01.22*



## Permit

| | |
|---|---|
| Is coverage under a Multi-Sector Generic Permit (MSGP) required? | Yes |
| If 'No,' why not? | Not Applicable |
| Has an MSGP been applied for? | Yes |
| If 'Yes,' is the permit Active? | Yes |
| If 'No,' why not? | Not Applicable |

Comments:
The facility currently has permit coverage under Sector A of the MSGP. It appeared the facility also conducts freighting operations that may fall under SIC Code 4011 or 4013: Railroad Transportation. This would subject operations to Sector P in addition to Sector A. It is recommended that the facility contact the Notices Center to make an additional permitting determination.

**Rating:** This item is rated as 'Satisfactory'.

## Condition of Receiving Waters

| | |
|---|---|
| Is stormwater discharge apparent at the time of the inspection? | No |
| Is there evidence that there has been a discharge of polluted runoff to a regulated receiving water (past or present)? | Yes |

If 'Yes', explain:
Unconfined black particulate matter was noted leaving the site in various areas. See Photos 2 - 4 of the attached photo log.

Comments:

**Rating:** This item is rated as 'Marginal'.

## Facility Site Review - No Exposure Certification (NEX)

| Are any of the following materials or activities exposed to precipitation: | |
|---|---|
| 1. Areas for storage, maintenance, washing, or use of industrial machinery or equipment? | Not Applicable |
| 2. Materials or residuals from spills/leaks on the ground or in stormwater inlets? | Not Applicable |
| 3. Materials or products from past industrial activities? | Not Applicable |
| 4. Material handling equipment (except for adequately maintained vehicles)? | Not Applicable |
| 5. Loading, unloading, or transportation of materials or products? | Not Applicable |
| 6. Materials or products stored outdoors (except for final products intended to be used outside)? | Not Applicable |
| 7. Materials contained in open, deteriorated, or leaking storage containers such as drums, barrels, or tanks? | Not Applicable |
| 8. Materials or products that are handled/stored on road or rails owned/maintained by the facility? | Not Applicable |
| 9. Waste materials (except for waste in covered, non-leaking containers (e.g., dumpsters))? | Not Applicable |
| 10. Process wastewater application or disposal (unless otherwise permitted)? | Not Applicable |
| 11. Particulate matter or visible deposits of residuals from roof stacks and/or vents not otherwise regulated (e.g., under an air quality control permit) and evident in stormwater discharges? | Not Applicable |

Comments:
Facility does not have a No Exposure Certification, therefore this section does not apply.

**Rating:** This item was not rated.

FLR05J393



# Department of Environmental Protection
# Industrial Stormwater Inspection Report
### Form DWRM - WCAP - 20 - 043
*Updated 08.01.22*

## Facility Site Review - Multi-Sector Generic Permit (MSGP)

| Have the provisions of the Stormwater Pollution Prevention Plan (SWPPP) been implemented? | Some |
|---|---|

If 'Some' or 'None', explain what has **not** been implemented:
The SWPPP did not match site conditions (Photos 1, 4, 5, & 8). Specifically, stockpiles, loading / unloading activities, and potential outfalls were noted throughout the southern portion of the site and operations have not commenced as noted; Unconfined PM was noted leaving the site (Photos 2 - 4); Good housekeeping BMPs were not being implemented (Photos 6 & 7).

| Is there a potential for the discharge of polluted stormwater from the site to a regulated receiving water or Municipal Separate Storm Sewer System (MS4)? | Yes |
|---|---|
| Are Best Management Practices appropriate for the activities occurring on site to protect regulated surface waters? | No |

## Best Management Practices (BMPs)

| Area of Concern | Which BMPs are currently employed at the facility? | Are BMPs maintained consistent with the SWPPP? | Do BMPs appear sufficient to protect surface waters? |
|---|---|---|---|
| Vehicle / Equipment Wash and Rinse Areas | N/A - No vehicle / equipment washing or rinsing areas were noted. | Not Applicable | Not Applicable |
| Fueling Areas | N/A - No fueling areas were noted. | Not Applicable | Not Applicable |
| Vehicle / Equipment Maintenance Areas | N/A - No vehicle / equipment maintenance areas were noted. | Not Applicable | Not Applicable |
| Outdoor Manufacturing Areas | N/A - No manufacturing areas were noted. | Not Applicable | Not Applicable |
| Outdoor Stockpile / Material Handling Areas | Heavy vegetation surrounded most of the treated-wood stockpiles. | No | No |
| Trash and Debris Areas | The dumpster noted on-site was covered. | Yes | Yes |
| Loading / Unloading Transfer Areas | Evidence of loading / unloading was noted along the southern portion of the site. | No | Yes |
| Illicit Connections to SW System (e.g., floor drains) | No illicit connections to the stormwater system were noted. | Not Applicable | Not Applicable |
| Chemical Storage Tanks (New and Used fluids) | It did not appear that any BMPs were being utilized. | No | No |
| Stormwater Treatment System | Most of the site is pervious. Low-lying areas and wetland indicators were noted immediately off-site. | No | No |
| | | | |
| | | | |

Comments:

**Rating:**  This item is rated as 'Marginal'.

FLR05J393



# Department of Environmental Protection
# Industrial Stormwater Inspection Report
### Form DWRM - WCAP - 20 - 043
*Updated 08.01.22*

## Plans/Monitoring - SWPPP

| | |
|---|---|
| Has a SWPPP been prepared for the facility? | Yes |
| Is the SWPPP available for review at the time of inspection? | Yes |
| Does the SWPPP appear accurate and up-to-date? | No |
| Does the SWPPP appear to meet the standards set forth in the MSGP (See the SWPPP Checklist for all applicable areas)? | No |
| Are applicable records kept for three (3) years from the date of collection? | No |

Comments:
The SWPPP did not include all documentation as required by the MSGP and did not accurately reflect current site conditions. Additionally, the SWPPP indicates "No" for discharging into an impaired water body. This is not correct as the Rainbow River is included on the most updated 303(d) list.

## Plans/Monitoring - Analytical Monitoring

| | |
|---|---|
| Is the facility subject to analytical monitoring requirements? | Yes |
| If so, have the following conditions been met: | |
| - Has a monitoring schedule been identified? | Yes |
| - Has sampling been performed per the minimum requirements of the MSGP? | No |
| - Have the Discharge Monitoring Reports (DMRs) been submitted to the Department as required by the MSGP? | Not Applicable |
| Has the facility reported any benchmark exceedances on DMRs submitted during the current permit cycle? | Not Applicable |
| - If 'Yes', did the facility document a re-evaluation of the SWPPP measures and controls to address exceedances? | Not Applicable |
| - Have all noted updates to measures and controls been implemented at the facility? | Not Applicable |

Note: Failure to amend and implement changes to the SWPPP as result of benchmark exceedance(s) constitutes a violation of Parts IV and IV.C. of the MSGP. Benchmark exceedance(s) may indicate a cause or contribution to water quality impairments.

Comments:
The facility obtained permit coverage went into effect on September 11, 2025. The year two monitoring period begins January 1, 2026, and ends December 31, 2026. Quarterly Discharge Monitoring Reports (DMRs) during this period must be submitted to the Department no later than March 31, 2026.

## Plans/Monitoring - Compliance Monitoring

| | |
|---|---|
| Is the facility subject to compliance monitoring requirements? | No |
| If so, what frequency are the following activities conducted at the facility: | |

| Activity | Conducted | Frequency of Activity |
|---|---|---|
| - Wet Deck Storage | N/A | Not Applicable |
| - Phosphate Fertilizer Manufacturing | N/A | Not Applicable |
| - Asphalt Paving / Roofing Emulsions Production | N/A | Not Applicable |
| - Cement Manufacturing | N/A | Not Applicable |
| - Coal Pile Storage | N/A | Not Applicable |

| | |
|---|---|
| Are discharges sampled at least once per year and tested for the effluent limited parameters specified for the activities? | Not Applicable |
| Are the discharge samples subject to the numeric effluent limitations prior to mixing with other discharges? | Not Applicable |
| Have the compliance monitoring DMRs been submitted to the Department by the March 31st deadline, of the year following monitoring? (e.g., results are due by March 31, 2018 for a sample collected in 2017) | Not Applicable |

Comments:
The facility is not subject to compliance monitoring requirements at this time.

FLR05J393



# Department of Environmental Protection
# Industrial Stormwater Inspection Report

Form DWRM - WCAP - 20 - 043
*Updated 08.01.22*



## Plans/Monitoring - Annual Comprehensive Site Compliance Evaluation (ACSCE)

| | |
|---|---|
| Did the facility perform an ACSCE in the past 12 months? | Not Applicable |
| Does the report contain the following: | |
| - Scope of the evaluation? | Yes |
| - Date of the evaluation? | Yes |
| - Any major observations relating to the implementation of the SWPPP? | No |
| Have the following conditions been met? | |
| - A determination of the effectiveness of the SWPPP? | No |
| - An assessment of compliance with the terms of the MSGP? | No |
| - A report documenting the results of the evaluation, and any required updates to the site / SWPPP? | No |
| Have the results of the ACSCEs been maintained for a minimum of three (3) years from the date of collection? | Not Applicable |

Comments:
Language regarding ACSCEs did not appear to be included in the SWPPP narrative. Inspection templates were available for review, but were not sufficient. See table above. The facility must conduct an ACSCE at least once a year (every 12 months). The ASCE must be conducted at least prior to September 11, 2026.

## Plans/Monitoring - Quarterly Visual Monitoring (QVM)*

| | |
|---|---|
| Has a schedule been identified to complete QVM? | Yes |
| Has the facility performed quarterly visual examinations of stormwater (more specifically, in the last 4 quarters)? | No |
| If so, have the following conditions been met? | |
| - Reports include observations of color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, or other obvious indicators of stormwater pollution? | Yes |
| - Reports include time, date, location, and name of personnel collecting the sample? | Yes |
| - Reports include probable sources of any observed indicators of stormwater pollution? | Yes |
| Have the results of the QVM been maintained for a minimum of three (3) years from the date of collection? | No |

Comments:
QVM templates were available for review and met criteria. However, no complete records were available for review.

*Sector S facilities do not have a QVM requirement, therefore this section does not apply to Sector S.*

| | |
|---|---|
| **Rating:** This item is rated as 'Marginal'. | |

FLR05J393



# Department of Environmental Protection
# Industrial Stormwater Inspection Report
Form DWRM - WCAP - 20 - 043
*Updated 08.01.22*

## Plans/Monitoring – Industrial SWPPP Checklist

| Section | Yes / No | Comments |
|---|---|---|
| Is the SWPPP current and up-to-date? | No | The SWPPP did not reflect active site conditions and, therefore, was not current [Part IV.C. of the MSGP]. |
| Pollution Prevention Team | Yes | |
| Description of Potential Pollutant Sources | No | Potential pollutant sources from loading and unloading , and on-site waste disposal activities was not included in the narrative [Part XI.A.3.a.(2)(e)]. |
| Drainage | No | The site map was not current. The most southern portion of the site was not depicted. Treated wood storage, loading and unloading, and waste disposal areas [Part XI.A.3.a.(2)(a)]. |
| Inventory of Exposed Materials | No | The list of industrial materials or activities that are exposed to stormwater did not include waste disposal [Part XI.A.3.a.(2)(b)]. |
| Significant Spills and Leaks | Yes | No reported spills and/or leaks within the past 3 years. |
| Non-Stormwater Discharges | No | No non-stormwater discharge evaluation and certification was included [Part XI.A.3.a.(3)(g)]. |
| Sampling Data | Yes | No sampling data has been collected yet. |
| Summary of Potential Pollutant Sources | No | Potential pollutant sources specifically from loading and unloading, and on-site waste disposal activities were not included [Part XI.A.3.a.(2)(e)]. |
| Measures and Controls | No | The SWPPP did not meet the requirements of Part XI.A.3.a.(3). See below. |
| Good Housekeeping | No | Routine inspections are noted for raw material staging areas, vegetated areas, and for equipment and vehicles. No inspection / maintenance records available [Part XI.A.3.a.(3)(f)]. |
| Preventative Maintenance | No | Routine preventative maintenance of vehicles / equipment and stormwater systems are required. No inspection / maintenance records available [Parts XI.A.3.a.(3)(b) and (f)]. |
| Spill Prevention and Response | No | No response schedule appeared to be present to limit tracking of spilled materials to other areas of the site [Part XI.A.3.a.(3)(c)]. |
| Inspections | No | Facility representative confirmed over the phone that inspections are not being conducted. No records were available for review [Parts XI.A.3.a.(3)(d) and (f)]. |
| Employee Training | No | No periodic frequency is specified in the SWPPP. Training materials and records were not available for review [Part XI.A.3.a.(3)(e)]. |
| Record Keeping | No | Periodic and quarterly inspection and maintenance records, employee training records, and quarterly visual monitoring records, were not available for review. |
| Sediment and Erosion Control | Yes | |
| Management of Runoff | Yes | |
| Annual Comprehensive Site Compliance Evaluation | No | ACSCEs were not included in the SWPPP narrative and the routine inspection report template does not include any major SWPPP observations [Part XI.A.3.a.(4)]. No records reviewed. |

FLR05J393

# Department of Environmental Protection
# Industrial Stormwater Inspection Report
### Form DWRM - WCAP - 20 - 043
*Updated 08.01.22*

## Inspection Rating Determination Form

**Point Total:** 10      Out of Compliance

**Letter Type:** 6-12 Compliance Assistance Offer Letter      **Letter to Send:** Compliance Assistance Offer Letter

**S** = Satisfactory      **M** = Marginal      **U** = Unsatisfactory      **N** = Not Evaluated

---

### S    Permit

| | | Pts |
|---|---|---|
| S | Has a Permit or Exclusion from coverage, and NOI is located on site | 1 |
| M | Has applied for Permit or Exclusion from coverage, but it is not active | 2 |
| U | Has not obtained permit coverage, or does not qualify for a No Exposure Exclusion | 10 |

---

### M    Condition of Receiving Waters

| | | Pts |
|---|---|---|
| S | Receiving water is *not* impacted from the offsite discharge of polluted runoff | 1 |
| M | Receiving water is *moderately* impacted from the offsite discharge of polluted runoff | 3 |
| U | Receiving water is *significantly* impacted from the offsite discharge of polluted runoff | 6 |
| N | No inspection completed, or access to discharge areas was not able to be obtained | 0 |

---

### M    Facility Site Review

| | | Pts |
|---|---|---|
| S | Overall, the site poses little to no chance for the offsite discharge of polluted stormwater | 1 |
| M | Overall, the site poses a moderate chance for the offsite discharge of polluted stormwater | 3 |
| U | Overall, the site poses a significant chance for the offsite discharge of polluted stormwater | 6 |
| N | No inspection completed, or access to the facility was not able to be obtained | 0 |

---

### M    Plans/Monitoring

| | | Pts |
|---|---|---|
| S | SWPPP is complete. Required records are up to date and accurate | 1 |
| M | SWPPP is not more than 50% incomplete and/or not updated. Incomplete records, or inspections/reports are no more than 12 months past due | 3 |
| U | No SWPPP, or SWPPP is more than 50% incomplete. No records within the previous 12 month period | 6 |
| N | No permit, or a SWPPP is not required | 0 |

FLR05J393



# Department of Environmental Protection
# Industrial Stormwater Inspection Report
Form DWRM - WCAP - 20 - 043
*Updated 08.01.22*

## Single Event Violations

| Check for Yes | Eval Area | Finding Code | SEV Code | Description |
|---|---|---|---|---|
| ☐ | RRPT | STM2 | D0N11 | The facility was discharging without an industrial stormwater generic permit. |
| ☑ | RRPT | STM3 | B0N12 | The facility failed to conduct inspections according to the industrial stormwater generic permit. |
| ☑ | FACS | STM4 | B0N18 | The facility failed to implement the stormwater pollution prevention plan for the industrial stormwater generic permit. |
| ☑ | RRPT | STM5 | B0N41 | The facility failed to maintain records for the industrial stormwater generic permit. |
| ☑ | RRPT | STM6 | C0N11 | The facility failed to monitor according to the industrial stormwater generic permit. |
| ☑ | RRPT | STM7 | B0N17 | The facility failed to develop any or an adequate stormwater pollution prevention plan for the industrial stormwater generic permit. |
| ☑ | FACS | STM8 | BN19A | The facility failed to properly install/implement best management practices. |
| ☐ | FACS | STM9 | BN19B | The facility failed to properly operate/maintain best management practices. |
| ☐ | RRPT | STMA | E0N16 | The facility failed to submit the required non-DMR report for the industrial stormwater generic permit. |
| ☐ | RPPT | STMB | D0N18 | The facility did not submit a Notice of Termination once all stormwater discharges associated with industrial activities had ceased. |

## Inspector Comments

Rationale for Letter:

## Manager/Reviewer Comments

Concur with Recommendation?    ⦿ Yes    ○ No

Comments:

## Inspector Signature

Signed:  Dec 19, 2025

## Manager/Reviewer Signature

*Colin Campbell*

Signed:  Dec 19, 2025

FLR05J393



# Florida Department of Environment Protection
## Inspection Photo Log



**Permit Number:** FLR05J393



# Comments:

Photo 1 – December 15, 2025 – 10:44am
Photo taken by Kage Horvath

Treated-wood stockpiles stretched from approximately 29°03'40.5" N 82°27'00.4"W to approximately 29°03'17.4" N 82°27'21.2"W. Vegetation was present surrounding a majority of the stockpiles, indicating length of time exposed to precipitation and also acting as a natural buffer. Stockpiles were surrounded by pervious surface.

Stockpiles along this area were not noted in the SWPPP nor depicted on the facility site map.



# Florida Department of Environment Protection
## Inspection Photo Log



**Permit Number:** FLR05J393



# Comments:

Photo 2 – December 15, 2025 – 10:57am
Photo taken by Kage Horvath

Photo taken at 29°03'22.1"N 82°27'16.8"W facing S/SW. Black unconfined particulate matter was noted along the railroad tracks, leaving the site in various areas. See photos 3 and 4 below.



# Florida Department of Environment Protection
## Inspection Photo Log



**Permit Number:** FLR05J393



# Comments:

Photo 3 – December 15, 2025 – 11:51am
Photo taken by Kage Horvath

Photo taken at 29°03'54.2"N 82°26'48.8"W facing N/NE. Black unconfined particulate matter was noted leaving the site.



# Florida Department of Environment Protection
## Inspection Photo Log



**Permit Number:** FLR05J393



# Comments:

Photo 4 – December 15, 2025 – 11:14am
Photo taken by Kage Horvath

Photo taken at 29°03'17.3"N 82°27'19.6"W facing S/SE. Black unconfined particulate matter was noted leaving the site, moving towards a low-lying area. Evidence of pollutants in this area indicates an additional outfall that was not noted in the SWPPP.



# Florida Department of Environment Protection
## Inspection Photo Log



**Permit Number:** FLR05J393



# Comments:

Photo 5 – December 15, 2025 – 11:03am
Photo taken by Kage Horvath

Photo taken at 29°03'17.2"N 82°27'20.9"W facing W/NW. Evidence of loading / unloading activities were noted throughout the southern portion of the site and did not appear to be included in the SWPPP.



### Florida Department of Environment Protection
### Inspection Photo Log



**Permit Number:** FLR05J393



## Comments:

Photo 6 – December 15, 2025 – 11:09am
Photo taken by Kage Horvath

Photo taken at 29°03'16.6"N 82°27'20.3"W facing E/SE. Unconfined treated-wood materials noted near low-lying areas leading off-site.



# Florida Department of Environment Protection
## Inspection Photo Log



**Permit Number:** FLR05J393



## Comments:

Photo 7 – December 15, 2025 – 11:36am
Photo taken by Kage Horvath

Photo taken at 29°03'46.3"N 82°26'53.8"W. Used oil drum noted outdoors.

Good Housekeeping BMPs were not being utilized in accordance with the SWPPP. Specifically, the SWPPP stated that used drums and product containers should be stored under cover. The drum appeared to be corroded, indicating length of time exposed to precipitation.



### Florida Department of Environment Protection
### Inspection Photo Log



**Permit Number:** FLR05J393



## Comments:

Photo 8 – December 15, 2025 – 11:58am
Photo taken by Kage Horvath

Photo taken at 29°04'03.1"N 82°26'48.5"W facing N/NE. Inspectors confirmed that no operations are currently being conducted on-site. The SWPPP did not match site conditions.